STATE OF CONNECTICUT *v.* DEREK ROSEBORO
(14216)

PETERS, C. J., CALLAHAN, GLASS, COVELLO and BORDEN, Js.

Argued January 7—decision released March 17, 1992

*Suzanne Zitser,* assistant public defender, with whom, on the brief, were *G. Douglas Nash,* public defender, and *Kent Drager,* assistant public defender, for the appellant (defendant).

*Rita M. Shair,* assistant state's attorney, with whom were *Steven M. Sellers,* assistant state's attorney, and, on the brief, *Mary M. Galvin,* state's attorney, for the appellee (state).

PETERS, C. J. The principal issue in this appeal is the effect of a declarant's hospitalization and medication on the admissibility of his incriminatory statements in criminal proceedings against him. The defendant, Derek Roseboro, was charged, by a substitute information, with the crimes of capital felony in violation of General Statutes § 53a-54b (8), three counts of murder in violation of General Statutes § 53a-54a (a), and first degree burglary in violation of General Statutes § 53a-101 (a) (1) and (2).[1] A probable cause hearing

---

[1] General Statutes § 53a-54b provides in relevant part: "A person is guilty of a capital felony who is convicted of any of the following . . . (8) murder of two or more persons at the same time or in the course of a single transaction."

General Statutes § 53a-54a provides in relevant part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

General Statutes § 53a-101 provides in relevant part: "(a) A person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and: (1) He is armed with explosives or a deadly weapon or dangerous instrument, or (2) in the course of committing the offense, he intentionally, knowingly or recklessly inflicts or attempts to inflict bodily injury on anyone."

determined that the state had adduced sufficient evidence to try the defendant for capital felony and murder. The defendant waived his right to a jury trial, electing instead a court trial by a three judge panel. The trial court rendered a verdict in which it concluded that the defendant was guilty as charged. In accordance with the defendant's election to have the trial court conduct the sentencing hearing, the trial court considered whether to impose the death penalty for the defendant's conviction of the capital felony. The trial court rendered a judgment sentencing the defendant to life imprisonment without the possibility of release on the conviction of capital felony; General Statutes §§ 53a-35b and 53a-46a (f);[2] and to twenty years of concurrent imprisonment on his conviction of first degree

[2] "[General Statutes] Sec. 53a-35b. 'LIFE IMPRISONMENT' DEFINED. A sentence of imprisonment for life shall mean a definite sentence of sixty years, unless the sentence is life imprisonment without the possibility of release, imposed pursuant to subsection (f) of section 53a-46a, in which case the sentence shall be imprisonment for the remainder of the defendant's natural life."

General Statutes § 53a-46a provides in relevant part: "HEARING ON IMPOSITION OF DEATH PENALTY. AGGRAVATING AND MITIGATING FACTORS. (a) A person shall be subjected to the penalty of death for a capital felony only if a hearing is held in accordance with the provisions of this section.

"(b) For the purpose of determining the sentence to be imposed when a defendant is convicted of or pleads guilty to a capital felony, the judge or judges who presided at the trial or before whom the guilty plea was entered shall conduct a separate hearing to determine the existence of any mitigating factor concerning the defendant's character, background and history, or the nature and circumstances of the crime, including any mitigating factor set forth in subsection (g), and any aggravating factor set forth in subsection (h). . . .

"(f) If the jury or, if there is no jury, the court finds that one or more of the factors set forth in subsection (h) exist and that no mitigating factor exists, the court shall sentence the defendant to death. If the jury or, if there is no jury, the court finds that none of the factors set forth in subsection (h) exists or that one or more mitigating factors exist, the court shall impose a sentence of life imprisonment without the possibility of release."

burglary.[3] The defendant has appealed directly to this court in accordance with General Statutes 51-199 (b).[4] We affirm the judgment.

The trial court, *Curran, Mancini* and *S. Freedman, Js.,* made the following findings of fact in delivering its verdict. The defendant, armed with a dangerous weapon and intending to commit a larceny, unlawfully entered and remained in a house in Derby owned by Mary Ferrara. In the course of committing this crime, the defendant engaged in a struggle with Mary Ferrara and intentionally killed her. The defendant also intentionally killed her son Joseph Ferrara and her niece Nina Ferrara. Each of the victims died of stab wounds.

The trial court found the defendant guilty of capital felony and of burglary beyond a reasonable doubt. The court noted that testimony concerning the defendant's handprints and a footprint at the Ferrara house provided physical evidence linking him to the scene of the crime. The court found, furthermore, that the defendant had secreted a number of items in the nearby underbrush in an effort to hide evidence of his crimes, and that he had attempted to clean the house in an effort to eradicate evidence of what had transpired there. The

[3] Although the trial court had determined that the defendant was guilty of the three counts of murder with which he had been charged, the court rendered no judgment on those counts, because the double jeopardy clause of the fifth amendment of the United States constitution forbids punishment for both a capital felony and the murder that constitutes a lesser included offense. *State* v. *Wood,* 208 Conn. 125, 145, 545 A.2d 1026, cert. denied, 488 U.S. 895, 109 S. Ct. 235, 102 L. Ed. 2d 225 (1988); *State* v. *Usry,* 205 Conn. 298, 318, 533 A.2d 212 (1987).

[4] General Statutes § 51-199 (b) provides in relevant part: "The following matters shall be taken directly to the supreme court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

court relied as well on evidence of consciousness of guilt, opportunity and motive, and on incriminatory statements that the defendant made to the police.

The defendant's appeal raises two issues. He maintains that: (1) the trial court, *Curran, Mancini* and *S. Freedman, Js.*, should have granted his motion for acquittal because the state produced insufficient evidence to sustain his conviction of capital felony and of burglary in the first degree; and (2) the trial court, *Fuller, J.*, should have granted his pretrial motion to suppress, which addressed both incriminating statements made by the defendant and physical items seized by the police. We are unpersuaded by either of these claims.

I

The defendant does not challenge the standard by which this court reviews claims relating to the sufficiency of the evidence to sustain a criminal conviction. "Whether we review the findings of a trial court or the verdict of a jury, our underlying task is the same . . . . We first review the evidence presented at trial, construing it in the light most favorable to sustaining the facts expressly found by the trial court or impliedly found by the jury. We then decide whether, upon the facts thus established and the inferences reasonably drawn therefrom, the trial court or the jury could reasonably have concluded that the cumulative effect of the evidence established the defendant's guilt beyond a reasonable doubt." *State* v. *Jarrett,* 218 Conn. 766, 770–71, 591 A.2d 1225 (1991); *State* v. *Steiger,* 218 Conn. 349, 378, 590 A.2d 408 (1991). Applying that standard in this case, we conclude that the evidence presented by the state could reasonably have persuaded the trial court, beyond a reasonable doubt, that the defendant had committed both a capital felony and burglary.

The defendant was charged with a capital felony for having murdered two or more persons, namely Mary Ferrara, Joseph Ferrara and Nina Ferrara, in the late evening hours of August 11, 1989, at Mary Ferrara's house in Derby. As the trial court observed in rendering its verdict, various items of physical evidence could reasonably be found to have placed the defendant at the scene of the crime. His hand, distinctive in its size, exactly matched the length and the width of a bloody handprint found on wallpaper in the bathroom of the Ferrara house, where the body of Joseph Ferrara was discovered. A similar handprint was found on a pillowcase near Nina Ferrara's body in a bedroom in the Ferrara house. A bloody footprint found under Nina's body was made by a sneaker with an identifiable brand name. A bloody watch, found on the floor of the Ferrara kitchen, evidenced damage consistent with a struggle between the defendant and Mary Ferrara. The watch was linked to the defendant by the testimony of a witness and by the discovery of a hair microscopically similar to his body hair. All three victims died from multiple stab wounds that were inflicted by a knife or knife-like instrument.

A search of the underbrush near the Ferrara house uncovered further incriminating evidence. A bag was found containing, among other items, a local newspaper addressed to the defendant's house, a surgical glove, a blood-stained sneaker, a blood-stained shirt, and some pantyhose. Forensic tests revealed that the blood on the sneaker and on the shirt matched that of the defendant and one of the victims. The sneaker was similar in size to, and of the same brand name as, the sneaker that had made the bloody footprint found in the house, and showed patterns of wear identical to that on sneakers worn by the defendant. A podiatry expert testified that this unique pattern was caused by a deformity in the defendant's foot. The pantyhose contained

a human hair similar to that of Mary Ferrara. An investigation at the defendant's house disclosed a number of rubber gloves similar to that found in the bag. Near a turnaround on the road on which the Ferrara house was located, the police found a teacup from the Ferrara house, as well as a trifold piece of paper commonly used to hold drugs.

The defendant's appearance and conduct corroborated his involvement in the Ferrara murders. Returning to his house two doors down from the Ferrara house, in the early morning hours of the day following the crime, the defendant was observed coming out of the woods, looking surprisingly cool and dry despite a night of heavy rain and humidity, and suspiciously devoid of curiosity about the extensive police activity at the scene. Shortly after the murders, police officers questioning the defendant at his house noticed that he had a swollen left hand and a cut on his right hand.[5] No money was found in the Ferrara house after the crime, contrary to Mary Ferrara's habit of keeping some $100 to $400 in cash in her house, and the defendant was seen uncharacteristically giving out money and drugs shortly after the occurrence of the murders. The defendant made statements about his whereabouts that were inconsistent with the observations of a police officer who saw the defendant entering a car with his girlfriend, Deborah Gorzelaney, and made inquiries about whether it was possible to obtain fingerprints from the inside of rubber gloves.

---

[5] As a result of these observations, the state police obtained a search and seizure warrant, which they served on the defendant. The police took the defendant to Derby police headquarters, where he was advised of his constitutional rights and questioned about the murders at the Ferrara house. The defendant consented to a search of his locker at his place of employment, and underwent blood tests at Griffin Hospital. Although he denied involvement in the Ferrara murders, the police viewed him as a suspect.

Much of this evidence also supported the defendant's conviction for burglary. The amended information charged that he had unlawfully entered and remained in the Ferrara house with the intent to commit larceny and, while there, armed with a dangerous instrument, had inflicted bodily injury on another person. When the defendant was apprehended, he had a knife in his possession. The trial court could have inferred that the defendant had used this knife to stab his victims, just as it could have inferred that he had taken money belonging to various members of the household when he left the scene of the crime.

The defendant's statements corroborated his guilt of both crimes. He admitted having been at the Ferrara house, having observed Mary Ferrara's body and having participated in cleaning up blood stains in the house, on his and Gorzelaney's clothing, and on Gorzelaney's car. Those statements, together with the other direct and inferential evidence reasonably connecting the defendant with the crimes with which he was charged, enabled the trial court to find him guilty beyond a reasonable doubt. The trial court was entitled to reject, as less credible, other testimony and inferences offered on behalf of the defendant.[6] See *State* v. *Grant,* 219 Conn. 596, 603, 594 A.2d 459 (1991); *State* v. *Sinclair,* 197 Conn. 574, 578, 500 A.2d 539 (1985).

---

[6] It is of no consequence that the evidence does not clearly establish which of the killings were committed by the defendant and which were done by his accomplice, Gorzelaney. Under General Statutes § 53a-8, a person may be prosecuted and punished as if he were the principal offender when, "acting with the mental state required for commission of an offense, [he] solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense . . . ." "Therefore, as we have stated in the past, the terms accessory and principal refer to the alternate means by which one substantive crime may be committed." (Internal quotation marks and brackets omitted.) *State* v. *Smith,* 212 Conn. 593, 598, 563 A.2d 671 (1989); see also *In re Ralph M.,* 211 Conn. 289, 299–300, 559 A.2d 179 (1989).

## II

The defendant's principal argument is not, however, that he is entitled to an acquittal but that he is entitled to a new trial because the trial court should have suppressed certain of his statements and one item of evidence. With respect to his statements, the defendant claims that they were: (a) involuntary; (b) inextricably related to certain of his statements that were suppressed; (c) not supported by a knowing, intelligent and voluntary waiver of his *Miranda* rights;[7] and (d) procured in violation of his invocation of his right to remain silent. With respect to the evidentiary item, the Ferrara teacup recovered in a turnaround near the Ferrara house,[8] the defendant disputes the court's ruling that this evidence was admissible under the inevitable discovery rule.

### A

The statements whose admissibility is at issue were made in the following circumstances. Although the Derby police had identified the defendant as a suspect in the Ferrara crimes, and had questioned him about his possible involvement, he was not immediately arrested. On August 27, 1989, the New Haven police received a complaint from Gorzelaney, the defendant's girlfriend, and another woman charging the defendant with having assaulted and kidnapped them at a house on Humphrey Street in New Haven. Sergeant Michael Sweeney, a New Haven police detective, after

---

[7] *Miranda* v. *Arizona,* 384 U.S. 436, 471–78, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[8] The defendant's pretrial motion to suppress also challenged the legality of the action of the police in seizing an umbrella from the defendant's locker at his workplace on August 29, 1989. Because the trial court agreed that the umbrella had been illegally seized, this seizure is not an issue in this appeal.

having alerted Derby police, went to Humphrey Street to investigate the complaint. Discovering that a burglar alarm had gone off at that address, Sweeney and other New Haven police officers pursued the defendant through the house and caught up with him in a bathtub, bleeding heavily from two self-inflicted stab wounds. While Sweeney was stanching the defendant's wounds, he persuaded the defendant to identify himself. Thereafter, at a time when both Sweeney and the defendant thought that the defendant was dying, the defendant, in reponse to Sweeney's questioning, first implicated himself in the killings in Derby, but then said that Gorzelaney was responsible. Sweeney asked what had happened, what weapon had been used, and whether anything had been taken from the Ferrara house. The defendant replied that he and Gorzelaney had taken a teacup, which they had used for cocaine, and had left the cup on a dirt path near a turnaround in the vicinity of the Ferrara house. This questioning occurred without the defendant's having been advised of his constitutional right to remain silent.

The police arranged for the defendant to be taken by ambulance to Yale New Haven Hospital. During the ride in the ambulance, he was questioned by Detective Martin White of the Connecticut state police and Detective Marcel Lajeunesse of the Derby police. The defendant answered some of their questions about the Ferrara murders, discussing the newspaper found in the bag in the underbrush and referring again to the teacup near the turnaround. He told them that he and Gorzelaney had been using drugs on the evening of the crimes, but that she had committed the murders. This questioning, too, occurred without advice to the defendant of his constitutional right to remain silent.

Upon the defendant's arrival at the hospital, he was taken to the hospital trauma area where he was diagnosed as having wounds that were serious enough to

require surgery, but were not fatal. In the emergency room, prior to the defendant's surgery, Sweeney advised the defendant of his constitutional right to remain silent, but continued to interrogate him despite the defendant's request that he "come back tomorrow." Most of the defendant's comments on that occasion related to his involvement, and Gorzelaney's involvement, with cocaine. He reiterated that it was Gorzelaney who had gone to the house armed with a knife.

On August 28, 1989, immediately after the defendant's surgery, and on several succeeding days, the police interviewed the defendant at the hospital. They relied on nursing personnel for a determination that the defendant, although medicated, was lucid and alert. Early on August 28, the defendant signed a *Miranda* waiver form with great difficulty, and agreed to talk to the police for five minutes. He told them how he and Gorzelaney had gained entry to the Ferrara house and that the crimes had occurred because Gorzelaney was in a frenzy as a result of the cocaine she had taken. He said he had seen Mary Ferrara's body as he entered. He described the amount of blood everywhere and the measures that he and Gorzelaney had taken to clean up the blood in the house, on their clothes, and on Gorzelaney's car. At subsequent interviews, starting later on August 28 and continuing intermittently until September 8, the defendant was regularly reminded of his constitutional rights, and made a number of statements, some not entirely consistent, about how far he himself had gone into the house, about how much he had seen, and about his role in cleaning up the house and the garbage on the porch. In an interview on August 29, he drew some sketches for the police of where he and Gorzelaney had been standing when they gained access to the house. At the end of this interview, he acknowledged that he was cooperating voluntarily, having been advised by his lawyer, earlier that

day, that he did not have to talk further to the police. The trial court conducted an extensive hearing and wrote a comprehensive memorandum of decision concerning the admissibility of these various statements. The court suppressed the first three statements as having been elicited, while the defendant was in custody, in violation of the rules of *Miranda* v. *Arizona,* 384 U.S. 436, 471–78, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The statements at Humphrey Street and in the ambulance were suppressed for failure to advise the defendant of his constitutional right to remain silent, while the statement in the hospital emergency room was suppressed for failure to honor the defendant's invocation of his right to remain silent. The court found the remaining statements admissible, however, concluding that the state had established their voluntariness and an intelligent, voluntary and knowing waiver of *Miranda* rights. The defendant maintains that the court should have excluded all the statements made by the defendant during his period of hospitalization at Yale New Haven Hospital. We disagree.

B

The defendant's central contention is that, in view of his physical condition, all the statements that he made on August 27 and thereafter should have been suppressed because they were involuntary. The defendant maintains that, upon an independent and scrupulous examination of the entire record to examine the constitutional validity of the trial court's adjudication of this factual issue; see *State* v. *Schroff,* 206 Conn. 182, 195–96, 536 A.2d 952 (1988); *State* v. *Shifflett,* 199 Conn. 718, 727, 508 A.2d 748 (1986); we should conclude that the trial court's finding of voluntariness was clearly erroneous. The defendant urges us to follow *Mincey* v. *Arizona,* 437 U.S. 385, 401–402, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978), in which the United States Supreme Court concluded that statements were

inadmissible because they resulted from interrogation in an intensive care unit under circumstances showing that Mincey's will had been overborne. If the statements elicited from the defendant at Humphrey Street, in the ambulance, and in the emergency room were involuntary as well as a violation of the defendant's *Miranda* rights, the defendant contends such an overbearing of the defendant's will would have constitutional implications for the admissibility of his subsequent statements to the police. *Oregon* v. *Elstad,* 470 U.S. 298, 309, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985).

In its inquiry into the voluntariness of all of the defendant's statements, the trial court applied the test of *Colorado* v. *Connelly,* 479 U.S. 157, 167–68, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986), and *Schneckloth* v. *Bustamonte,* 412 U.S. 218, 225, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). *State* v. *Schroff,* supra, 196; *State* v. *Barrett,* 205 Conn. 437, 451–52, 534 A.2d 219 (1987). Looking at the totality of the circumstances, the court considered whether the conduct of the police caused the will of the defendant to have been overborne and his capacity for self-determination to have been critically impaired. Distinguishing *Mincey* v. *Arizona,* supra, the court balanced the defendant's weakened physical condition against other indicia of voluntary conduct the accuracy of which is largely undisputed. The defendant readily answered the questions of the police officers. He had prior experience with the criminal justice system and therefore probably had received *Miranda* warnings on earlier occasions. He was an English speaking adult with a college education. The police questioned the defendant in interviews that were of relatively short duration. Except for the questioning in the emergency room, the defendant seemed willing to talk to the police. He seemed alert. In sum, the court was persuaded that the state had met its burden

of proving by a preponderance of the evidence that the defendant's self-inflicted wounds and hospital-administered medication did not impair his capacity to resist questioning by the police. See *State* v. *Wynter,* 19 Conn. App. 654, 658–60, 564 A.2d 296 (1989).

Our independent review of the record, the exhibits, and the tapes of the interviews with the defendant persuades us that, as a matter of federal constitutional law, the trial court's finding of voluntariness was not clearly erroneous. Although the police were aggressively pressing their investigation, the defendant repeatedly demonstrated a spirited capacity to resist questioning that he found inappropriate. While his responses to interrogation were at times inaudible and manifested some confusion, he voluntarily participated in a continued dialogue with the police except in the one instance, in the emergency room, that the trial court found to be a *Miranda* violation. On that occasion, any temporary inability to resist official questioning that the defendant may have manifested was attributable to his own imminent surgery, rather than to coercive conduct on the part of the police. "[I]n *Colorado* v. *Connelly,* supra, 163–64 . . . the court required police overreaching as the crucial element in any inquiry into constitutional voluntariness." (Internal quotation marks omitted.) *State* v. *Gonzalez,* 206 Conn. 213, 222, 537 A.2d 460 (1988); *State* v. *Northrop,* 213 Conn. 405, 419, 568 A.2d 439 (1990).

The defendant suggests that, if his federal constitutional claim fails, we should examine the voluntariness of his statements under the state constitution. On several occasions, we have left open the possibility that our state constitution might render a defendant's involuntary statements inadmissible even if they were motivated by factors other than police coercion. *State* v. *Northrop,* supra, 419–20; *State* v. *Gonzalez,* supra, 222; *State* v. *Barrett,* supra, 452; *State* v. *Smith,* 200

Conn. 465, 476, 512 A.2d 189 (1986). The factual predicate for such an inquiry is, however, a finding that, for whatever reason, the defendant's will was overborne. The trial court in this case found to the contrary. We are not persuaded that the record demonstrates that the defendant's physical condition left him at any time so enfeebled that we should conclude that the trial court's finding was clearly erroneous.

## C

Our conclusion upholding the trial court's finding that the defendant's statements to the police were voluntary makes it difficult for the defendant to prevail on the other issues that he raises about the admissibility of his statements. We need, therefore, to address these contentions only briefly.

Having concluded that the defendant's initial statements to the police were voluntary, although procured in violation of his *Miranda* rights, the trial court was justified in concluding that the *Miranda* violations did not taint the admissibility of his subsequent statements. As long as all of the statements were voluntarily made, the fact that the police procured those statements in violation of the defendant's *Miranda* rights does not create a presumption that the police acted coercively. *Oregon* v. *Elstad,* supra; *State* v. *Shifflett,* supra, 740–42; *State* v. *Derrico,* 181 Conn. 151, 167, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980).

The evidence that establishes the voluntariness of the defendant's statements equally establishes that his waiver of his *Miranda* rights was knowing, intelligent and voluntary. With respect to his waiver of these rights, the defendant relies on the same fact-bound contentions about the effect of pain and medication that the trial court found unpersuasive when it ruled on the overall voluntariness of his statements. In these cir-

cumstances, we do not subscribe to the defendant's contention that his waiver was ineffective.

The defendant maintains, finally, that the police violated his *Miranda* rights in their interrogations at the hospital because they failed to honor his requests that interrogation cease. The defendant maintains that the record shows that the police overrode these requests in violation of their constitutional duty at least to clarify his arguably equivocal invocation of his right to silence. See *Michigan* v. *Mosely,* 423 U.S. 96, 104, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975); *State* v. *Shifflett,* supra, 738–42. The record also shows that the defendant repeatedly expressed his desire to cooperate with the police in their inquiry and agreed with their suggestion to resume questioning him at a later time. In these circumstances, the trial court could reasonably find that the conduct of the police comported with the requirements of *Miranda* v. *Arizona,* supra.

### D

The defendant's final argument is that he is entitled to a new trial because the trial court should have suppressed the teacup taken from the Ferrara house. The police first learned about the existence of the teacup in one of the statements that the trial court ruled inadmissible because it had been procured in violation of the defendant's *Miranda* rights. The trial court nevertheless held that the teacup need not be suppressed because, prior to the defendant's statement, the police had already been engaged in such an extensive search of the area near the Ferrara house that the teacup would inevitably have been discovered without regard to the defendant's inadmissible statement. *Nix* v. *Williams,* 467 U.S. 431, 443, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984); *State* v. *Badgett,* 200 Conn. 412, 433, 512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct.

423, 93 L. Ed. 2d 373 (1986); *State* v. *Ortiz,* 14 Conn. App. 493, 502, 542 A.2d 734 (1988). We agree with the trial court.[9]

The court applied the inevitable discovery doctrine to the facts of this case with sensitivity to what the record showed. The court acknowledged that it was "arguably suspicious" that the police had found the teacup near the turnaround the day following the defendant's reference, during his ambulance ride to the hospital, to a teacup at that location. The court found credible, however, the testimony of Detective David Bates of the state police describing the far-reaching scope of the prior investigation by the police of the public area in the environs of the Ferrara house, including the specific place where the teacup was found. The court was entitled to infer that this ongoing search would inevitably have led, sooner or later, to the discovery of the teacup even though an earlier search of the entire area had evidently overlooked it. Considering the totality of the evidence and the inferences reasonably to be drawn therefrom, the trial court could reasonably have concluded that the state had met its burden of proving inevitable discovery by a preponderance of the evidence.

The judgment is affirmed.

In this opinion the other justices concurred.

---

[9] The state urges us to consider the admissibility of this evidence on an alternate ground, the independent source doctrine. In addition to the defendant's statements, the police had a statement given by Deborah Gorzelaney about the Ferrara murders, in which she indicated that she and the defendant had been using drugs at the turnaround where the teacup was found. The state maintains that the information contained in this statement would have been an independent, constitutional source for the evidence admitted at trial. See *Segura* v. *United States,* 468 U.S. 796, 813–16, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984); *Nix* v. *Williams,* 467 U.S. 431, 443, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984); *State* v. *Ostroski,* 201 Conn. 534, 542, 518 A.2d 915 (1986). We need not address this issue in light of our disposition of the inevitable discovery rule as applied in this case.