## STATE OF CONNECTICUT *v.* SOEUN KIM PIN
## (AC 18644)

Lavery, Schaller and Hennessy, Js.

Argued October 19, 1999—officially released February 8, 2000

*Judith M. Wildfeuer*, deputy assistant public defender, for the appellant (defendant).

*Mitchell S. Brody*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Dennis J. O'Connor*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SCHALLER, J. The defendant, Soeun Kim Pin, appeals from the judgment of conviction, rendered after a jury trial, of attempted murder in violation of General Statutes §§ 53a-49 (a) (2) and 53a-54a (a), attempted assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-59 (a) (2), and kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A). The defendant claims that the trial court improperly failed to suppress statements he made to medical personnel and the police. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In 1994, the victim, Kunteri Sem, who lived in Vermont, met the defendant, who lived in Bristol. Thereafter, the two became engaged and the defendant sent the victim money for marriage related expenses, including an engagement ring, which she purchased. The two agreed that the victim would visit the defendant at Christmastime, but she broke off the engagement before then. The victim offered to mail the engagement ring to the defendant, but he declined. She then agreed to deliver it in person and took a bus to Bristol on December 23, 1994.

Shortly after 3 p.m. on that day, the defendant picked up the victim from the bus station and drove to a highway overpass, where he pulled over to the side of the road and parked in such a way that the car's passenger door could not be opened. While the engine was running, the defendant punched the victim in the face and spit hot pepper into her eyes. While holding the victim by her hair, the defendant tried with his teeth to remove

the top of a plastic container filled with gasoline, but the victim wrestled the container away from him and placed it on the car floor.

At approximately 4:06 p.m., Trooper Tina Marie Miller of the Connecticut state police, while on routine patrol, observed the defendant in his vehicle, striking the victim and pulling her hair while the victim was shouting that the defendant was trying to kill her. In an attempt to get the defendant's attention, Miller banged on the windshield and the driver's door window and ordered the defendant to stop. The defendant acknowledged Miller's presence but continued to strike the victim. Miller attempted to enter the vehicle, but found the driver's door locked and the passenger door obstructed. Miller returned to her cruiser, called for assistance, got her police baton, returned to the defendant's vehicle and broke the driver's door window. In an attempt to break the defendant's grip on the victim, Miller hit the defendant's wrists and forearms with her baton to no avail. Miller also was unable to pull the defendant from the vehicle. Eventually, a civilian passerby helped Miller break the defendant's grip on the victim and extract him from the vehicle, whereupon Miller immediately handcuffed him. The defendant told Miller that he wanted to go to sleep, closed his eyes and fell to the ground.

The defendant was taken by ambulance to John Dempsey Hospital in Farmington. Miller followed the ambulance in her cruiser. The ambulance personnel found the defendant to be "unresponsive" and as having a Glasgow coma score of four on a scale of three to fourteen, indicating that he was opening his eyes only to painful stimulus without any verbal or motor response. The ambulance personnel administered a three part "coma cocktail," intended to bring the defendant back to a conscious state.

At the hospital emergency room, several medical personnel examined the defendant in the presence of Miller. The first was Sharon Levesque, a registered nurse. When Levesque asked the defendant what had happened, he admitted four times that he wanted to kill the victim and himself. Marc Alan Borenstein, an emergency room physician, also examined the defendant. Borenstein's notes indicate that the defendant stated that the victim was returning the engagement ring and had told lies to the defendant. The defendant again admitted that he wanted to kill the victim and himself. Borenstein ordered a psychological examination to be performed by A. Aziz, a psychiatrist. During the examination, the defendant repeated his admission and added that he had intended to pour gasoline on the victim and himself and set them both on fire but that he was stopped by the police. Monica Driscoll and Diana Christensen of the Mobile Crisis Center (center) visited the defendant in the emergency room. When they asked the defendant what had happened, he responded that he had tried to kill the victim by setting her on fire with gasoline and a lighter, and that he also was going to set the vehicle and himself on fire and jump off the bridge, but that the police showed up and ruined his plan.

The defendant was discharged from the hospital at 11:30 p.m. Miller transported him to the state police barracks, where she read him his *Miranda*[1] rights. Because the defendant spoke broken English, Miller also explained the defendant's rights to him in layman's terms. The defendant stated that he understood his rights and signed a form to that effect at 11:59 p.m. The defendant also stated that he did not want to have an attorney present and that he wanted to speak with Miller. Thereafter, Miller prepared a statement and read

---

[1] *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

it back to the defendant, who signed it. The statement contained the following relevant language: "Two nights ago, I planned to kill my girlfriend. I wanted to put gas on her and on me, and put a light on her and me and burn her. I wanted to burn my car and then jump off the bridge and kill myself. I went to a gas station and put gas in my car and in a white plastic bottle. I hid a lighter in my pocket. I drove around yesterday and found the place to kill my girlfriend. . . .

"I hit my girlfriend in the car. I put hot red pepper spice in my mouth and chewed it. I spit it in her eyes so she won't look at me. I wanted to kill her. I don't want her to see me put gas on her. I want to put a light on her and burn her and put gas on me. I want to jump off the bridge. I hit her in her chest and neck. I kicked her with my legs. She was holding on to my hands so I kicked her. I tried to take out her eyes. I don't want her to see me. I wanted to take her eyes out of her head with my hands. I wanted to kill her with no problem. I wanted to kill her for changing her mind [about marrying me]. . . . I don't want to kill her now because there is no more fighting."

The jury found the defendant guilty of one count each of attempted murder, attempted assault in the first degree and kidnapping in the first degree. This appeal followed. Additional facts will be set forth as necessary.

The defendant claims that all of his statements were involuntary and, therefore, improperly admitted into evidence. The defendant concedes that there were no police threats or coercion and that, therefore, a federal constitutional claim is foreclosed by the United States Supreme Court's decision in *Colorado* v. *Connelly*, 479 U.S. 157, 167–68, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986).[2]

---

[2] Under *Connelly*, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado* v. *Connelly*, supra, 479 U.S. 167.

The defendant contends, however, that under article first, § 8, of the constitution of Connecticut,[3] he is afforded greater rights than under the due process clause of the federal constitution. The defendant argues that notwithstanding the lack of police coercion or misconduct, the court should have suppressed his statements because his mental condition coupled with the "inherently coercive" environment of a hospital emergency room and a police barracks rendered his statements involuntary.

At issue is the admission into evidence of five separate inculpatory statements. The defendant contests the admissibility of statements he made at the hospital to Levesque, Borenstein and Aziz, and to Driscoll and Christensen of the center, as well as the statement he gave to the police. During his trial, before any of these statements were admitted, the defendant orally moved to suppress, on the basis of involuntariness, the statements to Levesque, the members of the center and the police.[4] Whether the court properly admitted those three statements are, therefore, issues properly preserved for our review.

With respect to the remaining two statements, the defendant posits that he is entitled to review of these unpreserved claims pursuant to *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists

---

[3] Article first, § 8, of the constitution of Connecticut provides in relevant part: "No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law . . . ."

[4] In support of his motion, the defendant relied on article first, § 8, of the constitution of Connecticut.

and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) Id., 239–40.

Because the defendant argued before the trial court that the statements made to Levesque and the members of the center were inadmissible under article first, § 8, of the constitution of Connecticut, the parties and the court developed a record adequate for the appellate resolution of the admissibility of those statements. In addition, the circumstances surrounding the statements made to Borenstein and Aziz were virtually identical to those surrounding the statements made to the other medical personnel. The record is, therefore, equally adequate to review the defendant's claims of error with respect to the Borenstein and Aziz statements. See id. Furthermore, "any criminal trial use against a defendant of his involuntary statement is a denial of due process of law . . . ." *Mincey* v. *Arizona*, 437 U.S. 385, 398, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978). Thus, the defendant's claims are of constitutional magnitude alleging the violation of a fundamental right. See *State* v. *Golding*, supra, 213 Conn. 239–40. Having established that the admissibility of all five statements is reviewable, we turn to the merits of the defendant's appeal.

In support of his argument that we should depart from federal methodology, the defendant utilizes four of the six criteria our Supreme Court recognizes for determining whether our state constitution affords Connecticut citizens greater individual liberties than does its federal counterpart, namely, holdings and dicta of our Supreme Court, federal precedent, decisions of our sister states and history. See *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992). Whether our state constitution might render a defendant's involuntary statements inadmissible even if they were motivated

by factors other than police coercion is an open question. *State* v. *Roseboro*, 221 Conn. 430, 443, 604 A.2d 1286 (1992); *State* v. *Northrop*, 213 Conn. 405, 420, 568 A.2d 439 (1990); *State* v. *Gonzalez*, 206 Conn. 213, 222, 537 A.2d 460 (1988); *State* v. *Barrett*, 205 Conn. 437, 452, 534 A.2d 219 (1987). Because we conclude that the record before us does not support a finding that the defendant's will was overborne to the point that his statements were given involuntarily, we need not resolve the state constitutional issue. See *State* v. *Roseboro*, supra, 444.

It is well settled that "[t]he state has the burden of proving the voluntariness of [a defendant's] confession by a fair preponderance of the evidence." (Internal quotation marks omitted.) *State* v. *Pinder*, 250 Conn. 385, 418, 736 A.2d 857 (1999); see *Lego* v. *Twomey*, 404 U.S. 477, 489, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972); *State* v. *James*, 237 Conn. 390, 411, 678 A.2d 1338 (1996). Our Supreme Court has recently clarified the proper scope of appellate review of a trial court's determination of voluntariness. See *State* v. *Pinder*, supra, 420. "To begin, we note the established rule that the [t]rial court's findings as to the circumstances surrounding the defendant's interrogation and confession are findings of fact . . . which will not be overturned unless they are clearly erroneous. . . . As [is] true concerning appellate review of determinations of custodial interrogation, although we give deference to the trial court concerning these subsidiary factual determinations, such deference is not proper concerning the ultimate legal determination of voluntariness. In its review of state court determinations of voluntariness, the United States Supreme Court long has concluded that the ultimate question whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution is a matter for independent federal determination. . . .

Consistent with the well established approach taken by the United States Supreme Court, we review the voluntariness of a confession independently, based on our own scrupulous examination of the record. The ambiguity apparent in [prior Connecticut Supreme Court] cases is that, while correctly citing to the relevant federal case law for the proposition that we will conduct an independent determination of voluntariness . . . [our Supreme Court has also] continued to state in these same cases that [o]n the ultimate issue of voluntariness . . . we will conduct an independent and scrupulous examination of the entire record *to ascertain whether the trial court's finding is supported by substantial evidence.* . . . [C]ontinued use of the substantial evidence language, when it is inconsistent with the plenary review that we in fact conduct, perpetuates a misstatement of the law. . . . [T]herefore, [the proper scope of review regarding] the ultimate issue of voluntariness requires us, not to ascertain whether the trial court's finding is supported by substantial evidence, but to conduct a plenary review of the record in order to make an independent determination of voluntariness." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 420–21.

## I

We first examine the four statements made by the defendant to medical personnel. Our plenary review of the record leads us to conclude that a preponderance of the evidence shows that the statements were voluntary.

In his brief, the defendant alleges that the following circumstances rendered his statements to medical personnel involuntary. The defendant is a Cambodian immigrant who speaks broken English. Immediately after being removed from his vehicle, the defendant was forcibly restrained and taken into police custody. The defendant immediately collapsed in a "catatonic

state" in which he remained until ambulance personnel arrived and put him in four-point restraints. The defendant was so unresponsive that the ambulance crew had to administer a "coma cocktail." Within twenty minutes of his arrival at the hospital, restrained, in police custody and very upset, the defendant made the statement to Levesque while Miller looked on. Then the defendant confessed to Borenstein, who was so concerned about the defendant's mental condition that he ordered the Aziz examination. The defendant also confessed to Aziz. Aziz concluded that the defendant was suicidal. Nearly five hours after arriving at the hospital, in restraints, under police guard and suicidal, the defendant confessed to the members of the center.

A review of the record reveals that the defendant's statements to medical personnel were consistent, detailed and coherent. There is no evidence that anyone to whom a statement was made acted in any way to compel the defendant to inculpate himself. Any inquiry was limited to that normally present in obtaining a medical history and current physical condition. A fair reading of the record indicates that the defendant's responses were the product of his will, not his surroundings.

As to the defendant's mental state, the record does not support his implicit contention that he was "catatonic" and that the medication administered to combat his condition acted to overbear his will. Miller testified at the suppression hearing that the defendant was acting, or "playing dead," when he went into his "catatonic state" at the crime scene to avoid cooperating with authorities. The court found Miller to be a highly credible witness.[5] Also, Borenstein testified at trial[6] that the

---

[5] We note that at his motion to suppress hearing, the defendant maintained that he did not remember making any of the statements. The trial court responded in its oral decision that the defendant's testimony was internally inconsistent, convenient and not credible.

[6] "We may consider the testimony adduced both at the trial and at the suppression hearing when determining the propriety of the trial court's

ambulance personnel's administration of the "coma cocktail" was protocol and not necessarily indicative of a particular mental state. It was Borenstein's expert opinion, based on the circumstances, that the defendant "chose not to respond." Furthermore, Levesque testified that a "coma cocktail" has no sedative effect and is, rather, designed to bring one back to a conscious state. Finally, Levesque and Borenstein testified that the defendant was alert and awake when he arrived at the hospital.

The fact that the defendant was a Cambodian immigrant who spoke broken English does not compel the conclusion that his statements were involuntary. Again, the defendant testified at the suppression hearing that he had no recollection of making statements. This is in direct contradiction with his theory that his nationality or lack of ability to speak English influenced his making of the statements. Moreover, the defendant had been in the United States six years at the time and spoke English well enough to be understood by others and to understand the language himself. The defendant also has not articulated any nexus between his "suicidal" condition and his independent compulsion to confess consistently four separate times to medical personnel, nor do we find any support for this contention in the record. We note also that the record fails to reveal any instance of the defendant being treated less than appropriately and that he was, in fact, offered food and drink.

On the basis of our plenary review of the entire record, we conclude that a preponderance of the evidence shows that the defendant's statements to Levesque and members of the center were voluntary. The

ruling on a motion to suppress a confession." *State* v. *Lapointe*, 237 Conn. 694, 704 n.15, 678 A.2d 942, cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996).

weight of the evidence is not tipped in the defendant's favor by his perfunctory assertion that the emergency room was "inherently coercive." With respect to the defendant's statements to Borenstein and Aziz, the court's admission of these statements was proper. We conclude that the alleged constitutional violation does not clearly exist and that the defendant's claim, therefore, fails to satisfy the third requirement of *Golding*. *State* v. *Golding*, supra, 213 Conn. 240.

## II

In support of his claim that his statement to the police was involuntary, the defendant adds that he was, by the time he made the statement, in custody for seven hours, under suicide watch, and had not been offered any food, drink, bathroom access or use of a telephone and had no interpreter present. We conclude that the state has satisfied its burden with respect to the voluntariness of this statement.[7]

The record reveals that the defendant gave normal responses to the explanation of his rights. He was not threatened or deprived of any necessities. Having been read his rights, the defendant indicated that he wanted to speak with Miller, demonstrating that he felt comfortable in his surroundings and was in control of his will. His actions while making the statement also were normal. Furthermore, the signed statement that the defendant gave to Miller was coherent, consistent with and in greater detail than his four previous statements.

During the time he spent at the police barracks, the defendant did not exhibit symptoms consistent with

---

[7] The defendant also claims that his waiver of his *Miranda* rights was invalid. The court found that the defendant's rights were understood and validly waived. The state must prove by a preponderance of the evidence that the defendant voluntarily, knowingly and intelligently waived his *Miranda* rights. *State* v. *Gonzalez*, supra, 206 Conn. 217. Our review of the entire record shows that the state has met its burden.

being either "catatonic" or suicidal. The record contains no direct evidence that the defendant's will was overborne by his mental condition or the environment of the police barracks. On the basis of our plenary review of the entire record, we conclude that a preponderance of the evidence shows that the defendant voluntarily confessed to Miller.

The judgment is affirmed.

In this opinion the other judges concurred.