## STATE OF CONNECTICUT *v.* ANGEL MEDINA, JR. (14135)

PETERS, C. J., CALLAHAN, BORDEN, BERDON and PALMER, Js.

Argued November 2, 1993—decision released January 18, 1994

*Lauren Weisfeld,* assistant public defender, with whom, on the brief, were *G. Douglas Nash,* public defendant, and *Suzanne Zitser,* assistant public defendant, for the appellant (defendant).

*Richard F. Jacobson,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *C. Robert Satti, Jr.,* assistant state's attorney, for the appellee (state).

PALMER, J. A jury found the defendant, Angel Medina, Jr., guilty of the crimes of murder in violation of General Statutes § 53a-54a,[1] possession of cocaine

---

[1] General Statutes § 53a-54a provides in relevant part: "MURDER. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . .

"(c) Murder is punishable as a class A felony . . . ."

with intent to sell in violation of General Statutes § 21a-277 (a), and possession of drug paraphernalia in a drug factory situation in violation of General Statutes § 21a-277 (c).[2] The defendant has appealed[3] from the judgment of the trial court sentencing him to a term of imprisonment of fifty-one years. He claims that the trial court improperly denied his motions: (1) to sup-

---

[2] General Statutes § 21a-277 provides in relevant part: "PENALTY FOR ILLEGAL MANUFACTURE, DISTRIBUTION, SALE, PRESCRIPTION, DISPENSING. (a) Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any controlled substance which is a hallucinogenic substance other than marijuana, or a narcotic substance, except as authorized in this chapter, for a first offense, shall be imprisoned not more than fifteen years and may be fined not more than fifty thousand dollars or be both fined and imprisoned; and for a second offense shall be imprisoned not more than thirty years and may be fined not more than one hundred thousand dollars, or be both fined and imprisoned; and for each subsequent offense, shall be imprisoned not more than thirty years and may be fined not more than two hundred fifty thousand dollars, or be both fined and imprisoned. . . .

"(c) No person shall knowingly possess drug paraphernalia in a drug factory situation as defined by subdivision (20) of section 21a-240 for the unlawful mixing, compounding or otherwise preparing any controlled substance for purposes of violation of this chapter."

General Statutes § 21a-240 (20) provides: "(A) 'Drug paraphernalia' refers to equipment, products and materials of any kind which are used, intended for use or designed for use in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing or concealing, or injecting, ingesting, inhaling or otherwise introducing into the human body, any controlled substance contrary to the provisions of this chapter . . .

"(B) 'Factory' means any place used for the manufacturing, mixing, compounding, refining, processing, packaging, distributing, storing, keeping, holding, administering or assembling illegal substances contrary to the provisions of this chapter, or any building, rooms or location which contains equipment or paraphernalia used for this purpose."

[3] The defendant appeals directly to this court pursuant to General Statutes § 51-199 (b) (3) which provides in relevant part: "The following matters shall be taken directly to the supreme court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony . . . for which the maximum sentence which may be imposed exceeds twenty years . . . ."

press certain incriminatory statements and for a new trial; (2) for a judgment of acquittal because the state failed to prove beyond a reasonable doubt that he possessed the requisite intent for the crime of murder; and (3) for a judgment of acquittal because the evidence established his affirmative defense of insanity. For the reasons set forth below, we are not persuaded that the defendant's claims are meritorious, and we therefore affirm the trial court's judgment.[4]

The jury could reasonably have found the following facts. On September 13, 1986, at approximately 11:45 a.m., the Bridgeport police responded to a telephone

[4] This case was originally argued on April 30, 1993, and decided on August 24, 1993. On October 4, 1993, the defendant filed motions: (1) for permission to file a late motion; (2) for reconsideration of the decision and resubmission to a reconstituted court; and (3) for permission to file those motions under seal. On October 7, 1993, we granted the first two motions and denied the third. The case was reargued on November 2, 1993.

The dissent asserts that we should not have granted the defendant's motion for reconsideration of this case by a reconstituted court without a more detailed factual record. We note, however, that the dissenter, along with all of the other members of this court who considered the defendant's motion, voted to grant that request. Only after the parties had been notified of our ruling on the defendant's motion did the dissenter inform the members of this court that, upon his sua sponte reconsideration of the motion, he had decided to change his vote. No request for reconsideration of our decision has ever been filed.

We disagree with the dissent because, in the particular circumstances of this case, we are fully satisfied that the appropriate course was to have granted the defendant's motion for reconsideration by a reconstituted court due to a conflict of interest of one of the justices who originally decided the case. These circumstances included the justice's acknowledgment both that he should have disqualified himself from participation in this case for the reasons stated in the defendant's motion, and that reconsideration of the case by a reconstituted court was the proper resolution of the issue. We further considered the fact that the state did not oppose the defendant's motion, and that the entire matter is, upon the request of the Chief Justice of this court, presently sub judice before the judicial review council.

We also disagree with the dissent that our action in this case may somehow tend to undermine the credibility of our judgments in other cases. We are satisfied that the fear expressed by the dissent that, as a result of our action in these rare circumstances, "all of our judgments would become suspect," is wholly without basis.

call from Lucy Ramirez, who had reported that her brother, the defendant, was brandishing a gun in her house. According to Ramirez, the defendant had arrived at her home acting "like a mad man." He talked about a mission he had to complete and stated that he had killed three demons. The defendant subsequently went outside to his car and returned with two guns, one tucked in his waistband and the other in his left rear pants pocket. Ramirez and her mother succeeded in distracting the defendant so that Ramirez could retrieve the gun from his waistband. She hid it and telephoned the police.

Ramirez met police officers Kevin Meizies and James Sheffield at the door to her home, and informed them that they would find the defendant in the kitchen and that he had a gun in his left rear pants pocket. Upon entering the kitchen, Meizies found the defendant standing with his hands in the air. He appeared to be upset and frightened. Meizies attempted to calm him and to distract him long enough to remove the gun. As Meizies was undertaking to disarm him, the defendant uttered "The devil made me do it," "[I] killed the devil," and "I am God." Meizies asked the defendant "if he was all right, what's the matter," and reached around him and removed the gun from the defendant's rear pants pocket. The .38 caliber weapon contained five spent cartridges.

Because the defendant continued to be upset, Meizies and Sheffield transported him, in handcuffs, to Bridgeport Hospital for observation. While en route to the hospital, the defendant continued to talk about both God and the devil and stated that "Mary gave me the drugs." The officers left the defendant at the hospital and returned to the police station.

Shortly after the defendant had departed for the hospital, Ramirez and her husband proceeded to the

defendant's apartment at 605 Hallett Street. Between 12:30 and 1 p.m., the couple entered a rear bedroom and there discovered the body of the victim, Mary Beth Buckley. They summoned the police and medical personnel and met the responding officer, Alan Kohlbacker, at 1:19 p.m. Kohlbacker secured the apartment and called for additional police and emergency medical personnel, who thereafter met Kohlbacker at the scene.

In the bedroom, the police found the victim's body seated on a bar stool with the right side of her head on the bar. There were four bullet holes in the closet door behind the victim. On top of the bar were white powder and drug paraphernalia.[5] The police also seized two empty gun holsters and several live rounds of ammunition that were in plain view on the bedroom floor, as well as a box of .45 caliber ammunition from the kitchen table.[6] Officers Meizies and Sheffield subsequently returned to the hospital to place the defendant under arrest for the murder of the victim.

An autopsy of the victim's body revealed that she had died from two bullet wounds that had been inflicted approximately four to six hours prior to the discovery of her body. One bullet had passed through her arm and into her chest. The other bullet had entered directly into her chest and passed through her heart and lung into her spine, severing the spinal cord. This bullet had

---

[5] These objects subsequently tested positive for the presence of cocaine.

[6] The police also conducted a warrantless search of the defendant's home upon locating the victim's body. The items seized pursuant to that search, a .12 gauge shotgun and three spent cartridges, were suppressed by the trial court upon motion of the defendant because their seizure did not fall into any recognized exception to the requirement that a search be conducted only with a warrant issued upon probable cause. See *Schneckloth* v. *Bustamonte,* 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973); *State* v. *Badgett,* 200 Conn. 412, 423, 512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986).

been fired from the handgun recovered from the defendant's pocket. A third bullet had caused only a superficial wound.

After the trial court, *Reilly, J.,* had found probable cause to continue the prosecution of the defendant for the crime of murder, the defendant, on October 28, 1987, was found incompetent to stand trial by the trial court, *Curran, J.,* and sent to Whiting Forensic Institute. Subsequently, on February 8, 1988, he was found competent to stand trial and pretrial hearings on various of the defendant's motions ensued. A jury of twelve found the defendant guilty of all charges and the trial court, *W. Sullivan, J.,* rendered judgment of conviction sentencing him to a term of imprisonment of fifty-one years.

I

The defendant first invokes the protections of the fifth and fourteenth amendments to the constitution of the United States, and article first, § 8, of the Connecticut constitution,[7] and claims that the trial court improperly denied his motion to suppress the incriminatory statements that he had made to the police in the kitchen of his sister's apartment and while en route to the hospital. Specifically, the defendant claims that these statements were elicited by the police in the absence of the warnings required by *Miranda* v. *Arizona,* 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d

---

[7] The fifth amendment to the United States constitution provides in relevant part: "No person shall be . . . compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law . . . ." The fifth amendment is applicable to state criminal prosecutions by virtue of the fourteenth amendment. *Malloy* v. *Hogan,* 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964).

Article first, § 8, of the Connecticut constitution provides in pertinent part: "No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law . . . ."

694 (1966); *State* v. *Falby,* 187 Conn. 6, 11 and n.1, 444 A.2d 213 (1982); and that the statements were involuntary due to his mental condition at the time he made them. We conclude that the statements were not obtained by the police in derogation of the defendant's *Miranda* rights, and that the defendant's mental state at the time he made those statements did not render them involuntary as a matter of law under the due process clause of the United States constitution. We also conclude that the defendant did not properly preserve his claim of involuntariness under the Connecticut constitution and that the record below is not sufficient for our review of that claim.

A

The state acknowledges that the police had not informed the defendant of his *Miranda* rights prior to the statements he made either in his sister's kitchen or on his way to Bridgeport Hospital. The state maintains, however, that *Miranda* warnings were not required because at no time was the defendant subjected to police interrogation. We agree with the state.

"Although the *Miranda* warnings were originally effective in state prosecutions only because they were a component of due process of law under the fourteenth amendment . . . they have also come to have independent significance under our state constitution. . . . The warnings represent the belief, deep-seated in the Anglo-American legal tradition, that a person accused of a crime may be convicted only if exacting measures have been taken to assure that the accused has been treated with the most scrupulous fairness by agents of the government." (Citations omitted.) *State* v. *Ferrell,* 191 Conn. 37, 40–41, 463 A.2d 573 (1983); see also *State* v. *Barrett,* 205 Conn. 437, 447, 534 A.2d 219 (1987). It is well settled, however, that a defendant is

entitled to such warnings only if the statements are the product of custodial interrogation. *State* v. *Rosado,* 218 Conn. 239, 252, 588 A.2d 1066 (1991), and cases cited therein.

"[T]he defendant has the initial burden of showing that he was subjected to custodial interrogation"; id.; before the state must prove that adequate warnings of the rights that inhere in the privilege against compelled self-incrimination were given to the defendant and that the defendant's waiver of his rights was constitutionally valid. *State* v. *Rasmussen,* 225 Conn. 55, 76, 621 A.2d 728 (1993); see also *State* v. *Weidenhof,* 205 Conn. 262, 267, 533 A.2d 545 (1987); *State* v. *Gray,* 200 Conn. 523, 531–33, 512 A.2d 217, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986). Unless it was clearly erroneous, we will accept the trial court's factual finding that the defendant was not the subject of a custodial interrogation. We will also, however, carefully review the record to determine whether the trial court's finding is founded on substantial evidence. See *State* v. *Rasmussen,* supra, 76–77.

Two conditions, therefore, give rise to the requirement of advice of rights under *Miranda:* (1) the suspect must be in the custody of law enforcement officials; and (2) the suspect must be subjected to interrogation. *State* v. *Vitale,* 197 Conn. 396, 411, 497 A.2d 956 (1985). To determine whether a suspect is in custody so as to require *Miranda* warnings, we inquire whether a reasonable person, in view of all the circumstances, would have believed that he or she was not free to leave.[8] *United States* v. *Mendenhall,* 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980); *State* v. *Rasmussen,* supra, 76; *State* v. *Oquendo,* 223 Conn. 635, 647,

---

[8] The defendant did not testify at the suppression hearing or at trial, and therefore there is no evidence regarding whether he subjectively believed that he was free to leave.

613 A.2d 1300 (1992). "The term 'interrogation' under *Miranda* is not limited to questioning explicitly designed to elicit an incriminating response but extends to any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from a suspect. The police, however, cannot be held accountable for the unforeseeable results of their words or actions. *Rhode Island* v. *Innis,* [446 U.S. 291, 301–302, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980)]; *State* v. *Palmer,* [206 Conn. 40, 62, 536 A.2d 936 (1988)]; *State* v. *Vitale,* supra, 411–12; *State* v. *Stankowski,* [184 Conn. 121, 136–37, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981)]." *State* v. *Rosado,* supra, 253. "Voluntary statements of any kind are not barred by the fifth amendment. *Miranda* v. *Arizona,* supra, 478." *State* v. *Vitale,* supra, 412.

We examine first the circumstances surrounding those statements made during the brief interval between the arrival of Meizies and his removal of the gun from the defendant's rear pants pocket. Meizies, who had been told by Ramirez that the defendant had a gun in his pocket, testified that the defendant had been waving his hands in the air and uttering religious expressions when Meizies confronted him in the kitchen. At that point, Meizies attempted to ascertain why the defendant appeared to be upset and what further action, if any, might be appropriate. Only when Meizies had determined that the defendant in fact had a gun and that his conduct warranted arrest did Meizies secure the weapon and take him into custody. This factual history persuades us that a reasonable person would not necessarily have believed that he or she was not free to leave. The record, therefore, supports the trial court's determination that the defendant was not

in custody prior to the seizure of his weapon and that *Miranda* warnings were not required prior to that time.

Moreover, even if we assume that the defendant had been in police custody upon Meizies' entrance into the kitchen, we are not persuaded that *Miranda* warnings were required. The defendant was standing with his arms in the air and was acting upset and frightened when Meizies walked into the room. In response to this conduct, the officer asked the defendant "if he was all right, what's the matter, that was about it." Meizies, who was then unaware of the fatal shooting of the victim, further testified that the defendant had initiated their brief conversation and that "I wasn't really questioning him, I was just trying to get a little bit of control of the situation . . . basically to try to quell the situation." Our review of the record discloses police conduct that had only the intent and effect of calming the defendant and maintaining the safety of all at the scene. Because Meizies' conduct was neither intended nor reasonably likely to provoke an incriminatory response from the defendant; see *State* v. *Rosado,* supra, 253–54; *State* v. *Palmer,* supra, 62–63; *State* v. *Copeland,* 205 Conn. 201, 207–208, 530 A.2d 603 (1987); *State* v. *Evans,* 203 Conn. 212, 227, 523 A.2d 1306 (1987); *State* v. *Vitale,* supra, 408–12; the officer's prudent efforts to evaluate and ameliorate the situation, after the defendant had initiated the exchange; see *State* v. *Doehrer,* 200 Conn. 642, 645–48, 513 A.2d 58 (1986); did not constitute interrogation requiring *Miranda* warnings.[9]

The defendant argues also that the trial court should have suppressed his incriminatory statements made en

[9] The state also proposes that the public safety exception to the requirement of *Miranda* warnings applies to this case. *New York* v. *Quarles,* 467 U.S. 649, 104 S. Ct. 2626, 81 L. Ed. 2d 550 (1984). Because we affirm the trial court's denial of the defendant's motion on other grounds, we need not address this issue.

route to the hospital. The state concedes both that the defendant was in custody at that time and that he was not advised of his *Miranda* rights. In order to prevail on his suppression claim, therefore, the defendant need show only that he was interrogated by the police officers who accompanied him to the hospital. The defendant fails, however, to meet this burden. Although interrogation need not take the form of direct questioning; see *State* v. *Rosado,* supra, 253; the record does not disclose any police questioning of the defendant or any other police conduct that was likely to elicit an incriminating response.

The defendant maintains that his statements to the transporting officers should have been suppressed nevertheless because those statements were the product of the earlier "interrogation" in the kitchen. We already have determined, however, that the defendant was neither in custody nor the subject of police interrogation when he made the incriminatory statements in the kitchen. Accordingly, we conclude that the trial court properly denied the defendant's motions to suppress his statements and for a new trial.[10]

---

[10] The trial court initially denied the defendant's motion to suppress the statements made to the police in the kitchen and on the way to the hospital because "the defendant at that time was not a suspect." That ruling, without more, would not properly have resolved the defendant's claim, however, because the defendant, though not a murder suspect, would have been entitled to *Miranda* warnings had he been subjected to custodial interrogation. The trial court, however, more properly addressed the defendant's claim in its later ruling on the defendant's renewed motion to suppress, stating "[the defendant] was not under arrest; so they don't have to give rights unless the person is under arrest or suspected of a crime for which he's going to be interrogated or arrested." Although this ruling was cast in terms of arrest, rather than custody, it is sufficiently clear that the intent of the trial court was to focus on the appropriate factors. Moreover, absent a request for articulation, we read an ambiguous trial record to support, rather than undermine, the trial court's judgment.

B

The defendant claims, in the alternative, that the trial court improperly denied his motion to suppress his incriminatory statements because they were not voluntary. He argues that his capacity for self-determination was critically impaired because of his mental state at the time that he made the statements to the police. The defendant invokes applicable provisions of both the federal and state constitutions.

1

We review first the defendant's federal constitutional claim that "[t]he use of an involuntary statement of a defendant in a criminal trial violates a defendant's right to due process of law. . . . As a prerequisite to admissibility the state is required to prove, by a preponderance of the evidence, that under all the circumstances admissions by an accused were voluntarily made. *Lego* v. *Twomey,* 404 U.S. 477, 489, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972) . . . ." (Citations omitted.) *State* v. *Kane,* 218 Conn. 151, 160, 588 A.2d 179 (1991). Under the federal due process clause, however, the defendant must establish that his lack of voluntariness was the result of improper police activity. "The measure of voluntariness [under the federal constitution] is whether a review of all the circumstances surrounding the elicitation of the statement reveals that the conduct of the law enforcement officials involved was such as to overbear the will of the accused to resist and bring about a statement not freely determined." *State* v. *Rosado,* supra, 254–55. A statement by the defendant that is the product of police coercion, therefore, may not be used by the state against that defendant. *Colorado* v. *Connelly,* 479 U.S. 157, 163–64, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986); *State* v. *Roman,* 224 Conn. 63, 69, 616 A.2d 266 (1992), cert. denied,     U.S.     ,

113 S. Ct. 1868, 123 L. Ed. 2d 488 (1993). On appeal, we undertake "an independent and scrupulous examination of the entire record to ascertain whether the trial court's finding [with respect to voluntariness] is supported by substantial evidence." *State* v. *Smith,* 200 Conn. 465, 478, 512 A.2d 189 (1986); *State* v. *Rosado,* supra, 255.

The defendant's claim of coercive interrogation by the police is unsupported by the evidence.[11] The only question posed to the defendant by the police was Meizies' inquiry, upon his arrival at the Ramirez home, as to whether "[the defendant] was all right, what's the matter." As we have already determined, the defendant was not in custody at that time and the question was neither intended nor likely to prompt an incriminatory answer; Meizies merely was seeking to identify the cause of the defendant's behavior and to calm a potentially volatile situation. Nor is there any evidence that the conduct of the officers who transported the defendant to the hospital was in any way inappropriate. Indeed, the record indicates that the police were respectful of the defendant's rights and that their conduct was in no way provocative or improper.

---

[11] Our review of the record indicates that the defendant's federal constitutional claim that his statements were the product of police coercion was not raised by him before the trial court. The sole focus of his suppression claim, rather, was the requirement of *Miranda* warnings, and the sole issue litigated was whether the defendant had been subjected to custodial interrogation. At no time did the defendant argue that the statements were the result of police overreaching. The suppression rulings also reflect the trial court's understanding that the *Miranda* claim was the only issue to be resolved. We nonetheless conclude that the record is adequate for review of the defendant's federal constitutional claim that his statements were involuntary because his claim focuses on coercive interrogation. In the particular circumstances of this case, therefore, the factual findings concerning custodial interrogation provide a sufficient basis for review of the unpreserved claim concerning police coercion. The defendant may not prevail on this claim, however, because he has not established a violation of his federal constitutional rights. *State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

We conclude, therefore, that the statements made by the defendant to the police were not the product of police coercion and that, therefore, the trial court's admission of those statements did not offend the defendant's federal constitutional protection against the use of involuntary statements.

2

The defendant requests that we determine the contours of his right against compelled self-incrimination in accordance with the guarantees of article first, § 8, of the Connecticut constitution.[12] He asserts that our state constitutional protections against the admission of a defendant's involuntary statements, unlike the protections of the federal constitution as defined by the United States Supreme Court in *Colorado* v. *Connelly,* supra,[13] do not require a predicate showing of coercive police conduct. The defendant, noting that this court has "[o]n several occasions . . . left open the possibility that our state constitution might render a defendant's involuntary statements inadmissible even if they were motivated by factors other than police coercion"; *State* v. *Roseboro,* 221 Conn. 430, 443, 604 A.2d 1286 (1992); see also *State* v. *Northrup,* 213 Conn. 405, 419–20, 568 A.2d 439 (1990); *State* v. *Madera,* 210 Conn. 22, 47–48, 554 A.2d 263 (1989); *State* v. *Gonzalez,* 206 Conn. 213, 222, 537 A.2d 460 (1988); *State* v. *Evans,* supra, 243; urges us to reach this issue and to reject the requirement of coercive police conduct under our state constitution. Although it is clear that "in some instances . . . the protections afforded to the citizens

---

[12] See footnote 7.

[13] In *Colorado* v. *Connelly,* 479 U.S. 157, 167, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986), the court held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment," and the admissibility of a defendant's statement that is not the product of police overreaching is instead "a matter to be governed by the evidentiary laws of the forum."

of this state by our constitution go beyond those provided by the federal constitution"; *State* v. *Marsala,* 216 Conn. 150, 160, 579 A.2d 58 (1990); the defendant may not prevail in this court on his state constitutional claim because it was not properly raised and preserved in the trial court. The defendant has not satisfied the conditions established in *State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989), for appellate review of unpreserved constitutional claims.

The defendant's written motion to suppress statements[14] identified article first, § 8, of our state constitution as one of several bases upon which he claims that his statements should be excluded. The defendant further alleged in his motion that his statements were not made knowingly and voluntarily. The motion, unaccompanied by case citation or a memorandum, otherwise failed to explicate the nature of his state constitutional voluntariness claim.

A thorough review of the record reflects that the litigation of the defendant's voluntariness claim focused exclusively on the issue of whether the police were required to advise the defendant of his *Miranda* rights. At the conclusion of the evidentiary hearing on the defendant's motion to suppress tangible evidence[15]

---

[14] Exclusive of the prayer for relief, the defendant's motion to suppress statements reads in full: "The defendant moves pursuant to Section 821 of the Connecticut Practice Book, the Fourth, Fifth, Sixth and Fourteenth Amendments [to] the United States Constitution, and Article One, Sections Seven and Eight of the Connecticut Constitution, to suppress any and all statements of the defendant, written or oral, made to any agents of the State and any testimony in relation to said statements.

"In support thereof, the defendant alleges:

"a. Said statements were not made knowingly and voluntarily.

"b. Said statements were made without the assistance of counsel.

"c. The procurement of said statements was in violation of the defendant's rights as enumerated in the constitutional provisions herein cited.

"d. Said statements were the product of an illegal detainment."

[15] See footnote 6.

prior to the hearing on the defendant's motion to suppress statements, defense counsel explained that he was seeking to suppress any statements made by the defendant while in police custody on the grounds that those statements were not made knowingly and voluntarily. In response to the trial court's inquiry as to the basis for that claim, defense counsel agreed with the prosecutor's characterization of the claim as relating to the defendant's alleged "deficient and defective . . . mental state," and directed the court's attention to the earlier "testimony about the mental state of [the defendant] at the time the officer arrived [at the Ramirez home]." Defense counsel narrowed this claim, however, by then stating that the constitutional violations alleged in the suppression motion concerned the failure of the police to advise the defendant of his *Miranda* rights.

At the conclusion of the pretrial suppression hearing, the defendant's argument,[16] addressed solely to the *Miranda* issue, claimed that his statements were not made knowingly and voluntarily because he had not been given *Miranda* warnings. Defense counsel's brief

---

[16] The following is the complete text of the closing remarks of defense counsel at the suppression hearing: "It's clear that [the defendant] was in custody at the time at the Boston Avenue address. There's been testimony that he wasn't free to leave when the police officers arrived, that his responses at the scene resulted from questioning of the police officer, what happened, that there was a complaint of the breach of the peace. Breach of the peace is a crime. There was an expectation of having to deal with that, there's also an expectation that the person who was searched would have a weapon on him. There were two police officers present at the time and stayed with him at all times thereafter. The individual clearly was showing unusual behavior to the point where Officer Meizies believed that there was a psychological or mental problem requiring him to be taken to a hospital.

"We would contend that the questioning initiated by Officer Meizies resulted in the statements indicated in the State's disclosure; and that these statements should be suppressed because they were not made knowingly and voluntarily, that my client was not advised of his rights pursuant to the Constitution and *Miranda*; that the officer should have informed my

rebuttal[17] to the prosecutor's closing statement, which also focused exclusively on the applicability of *Miranda*, simply reiterated the defendant's position that he was in police custody at the time the statements were made. The trial court's ruling on the defendant's suppression motion reflects its understanding that the only issue before the court was whether *Miranda* warnings were required under the circumstances.[18]

At trial, defense counsel renewed his motion to suppress the statements made by the defendant while he was en route to Bridgeport Hospital.[19] He again limited his argument solely to the issue of custodial interrogation, as did the court in its denial of that renewed

client of his *Miranda* rights, that obviously the statements were made without assistance of counsel, that the statements were in violation of the defendant's rights against self-incrimination and were the product of an illegal detainment.

"We would ask Your Honor to suppress the statements in the— that allegedly were made by my client to this officer."

[17] Defense counsel stated: "Just in response, Your Honor, I believe the Court should find that under the circumstances that the defendant would reasonably believe that he was in custody with the police officers present, eventually he was cuffed, put in the back of a police car, even after allegedly incriminating statements were made, he was never warned of his *Miranda* rights and I think that the statements should be suppressed, Your Honor."

[18] The following is the complete statement of the court in connection with its ruling on the defendant's motion to suppress statements: "Gentlemen, there are two motions that I have to act on. One is a motion to suppress statements—that motion is denied—in which statements I heard were in the sister's house and in the police car and at that time, according to the testimony, and according to the facts that were presented to me, the defendant at that time was not a suspect. To my knowledge, there's no confession here nor any statement concerning the facts signed by the defendant."

[19] Defense counsel stated: "I would object to the use of the statement, Your Honor, inasmuch as the circumstances that [the defendant] found himself under were such that would suggest to a person that he was under arrest. That he was in an interrogatory situation. That he had been asked questions already. That he wasn't warned"; and, "[T]he argument that I would make is that there was an arrest for breach of the peace, that there apparently were grounds for an arrest for breach of the peace, that there was a custodial—that my client was taken into custody, that he had been

motion.[20] We find no other argument or mention of the voluntariness issue in the record of the proceedings below.

At no time thereafter did the defendant argue or identify any claim of involuntariness other than his claim under *Miranda*, or otherwise alert the court that he was pressing any such claim.[21] Nor did he request that the court amplify its rulings on the motion to suppress, even though those rulings clearly were limited to a consideration of the issue of custodial interrogation. The record, therefore, fails to support the claim that the defendant was pursuing a state constitutional claim that his statements were involuntary due to his

asked questions prior to being taken into custody, that he was never given his rights against efficient [sic] self-incrimination."

Defense counsel did not reargue his suppression motion with respect to the statements made by the defendant in the kitchen. He did, however, object to those statements as hearsay, and the trial court overruled that objection. That ruling is not a subject in this appeal.

[20] The court stated as follows: "[The police] were called down [to the Ramirez home] and . . . he was not under arrest; so they don't have to give rights unless the person is under arrest or suspected of a crime for which he's going to be interrogated or arrested."

[21] The defendant asserts that the reference to article first, § 8, of the Connecticut constitution in his motion to suppress statements, together with the police testimony concerning the defendant's bizarre behavior at the time he made the statements, reasonably should have alerted the trial court of the defendant's state constitutional claim that the statements were involuntary due to his mental condition. We disagree.

Article first, § 8, is the very provision under which *Miranda* warnings have "come to have an independent significance under our state constitution." *State* v. *Ferrell,* 191 Conn. 37, 40–41, 463 A.2d 573 (1983); *State* v. *Falby,* 187 Conn. 6, 11 and n.1, 444 A.2d 213 (1982). The simple invocation of that constitutional provision, therefore, was not sufficient to have placed the court on notice that the defendant was making a voluntariness claim other than his *Miranda* claim. Nor can we conclude that the testimony of the police officers concerning the defendant's unusual behavior, elicited during the hearing on the defendant's *Miranda* claim, somehow satisfied the defendant's obligation to articulate his claims with clarity and specificity. As we have indicated, the record reflects that the defendant did not raise the state constitutional claim in the trial court and it was neither the responsibility nor the province of the court to have done so.

mental condition at the time he made them. Furthermore, because the defendant did not clearly raise such a state constitutional claim in the trial court, the state was not put on notice that it was required to defend against such a claim. Thus, neither the state nor the trial court—nor this court on appeal—had the benefit of a complete factual inquiry into the defendant's mental condition at the time his statements were made.

A defendant "can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.) *State* v. *Golding,* supra, 239–40. "We have also held that we remain free to dispose of the claim by focusing on whichever condition is most relevant in the particular circumstances." (Internal quotation marks omitted.) *State* v. *Stanley,* 223 Conn. 674, 689, 613 A.2d 788 (1992). We conclude that the record of the proceedings below is not adequate for our review of the defendant's claim that the admission of his statements at trial violated his rights under the state constitution.

The trial court never ruled on the issue of the voluntariness of the defendant's statements under the state constitution because, as we have determined, that issue was not properly raised. We do not know, therefore, whether the trial court, after conducting a full evidentiary hearing and applying the state constitutional standard now urged by the defendant, would have found the defendant's statements to have been involuntary.

As we recently held in declining to review an unpreserved claim of constitutional error, "[s]ince such a determination is a question of fact, even if we were to agree with the defendant [on his interpretation of the Connecticut constitution], we would have to remand the case to the trial court for that factual determination, rather than to grant the defendant a new trial. Since, under the test in *Golding*, we must determine whether the defendant can *prevail* on his claim, a remand to the trial court would be inappropriate. The first prong of *Golding* was designed to avoid remands for the purpose of supplementing the record." (Emphasis in original.) *State* v. *Stanley*, supra, 689–90.[22] Because, as in *Stanley*, the defendant's claim cannot be resolved without a remand for an evidentiary hearing and findings on the issue of whether his allegedly impaired mental state rendered his statements involuntary,[23] we conclude that the record is inadequate[24]

---

[22] As we stated in *State* v. *Golding*, 213 Conn. 233, 240, 567 A.2d 823 (1989), "[t]he defendant bears the responsibility for providing a record that is adequate for review of his claim of constitutional error. If the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred, we will not attempt to supplement or reconstruct the record, or to make factual determinations, in order to decide the defendant's claim."

[23] That the defendant may have suffered from a mental illness at the time he made the incriminating statements does not necessarily mean that those statements were involuntary, even upon application of the state constitutional standard urged by the defendant. In resolving the voluntariness issue, the trial court would have been required to determine whether, notwithstanding any such mental illness, the statements were the product of the defendant's essentially free and rational choice. See *State* v. *Gonzalez*, 206 Conn. 213, 223, 537 A.2d 460 (1988). The trial court never decided that issue, however, because it was not asked to do so.

[24] The dissent argues that, in determining whether the record is sufficient for review, this court must apply a de novo standard of review to the question of the voluntariness of incriminating statements by a defendant because such a question is one of law rather than fact. In so doing, the dissent employs a standard of review that has never been adopted by this court, and that is contrary to all of our precedents regarding the question of the voluntariness of statements by a defendant.

for review of that claim. We decline, therefore, to decide his state constitutional claim.[25]

## II

The defendant concedes that he caused the death of the victim. He claims, however, that the trial court improperly denied his motions for a judgment of acquittal[26] because the state failed to prove beyond a reasonable doubt that he had the intent to kill the victim and that the evidence he introduced at trial established his affirmative defense of insanity by a preponderance of the evidence. See General Statutes §§ 53a-12 and 53a-13.[27] The defendant argues that the evidence offered by the state[28] to prove the requisite

[25] As we also noted in *State* v. *Stanley,* 223 Conn. 674, 690, 613 A.2d 788 (1992), "deciding this issue on this record would be contrary to our usual and prudent practice of only deciding a constitutional claim when it is necessary to the determination of the case."

[26] The defendant moved for acquittal both at the close of the state's case and also at the close of evidence.

[27] General Statutes § 53a-12 (b) provides: "When a defense declared to be an affirmative defense is raised at a trial, the defendant shall have the burden of establishing such defense by a preponderance of the evidence."

General Statutes § 53a-13 provides in relevant part: "(a) In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law.

"(b) It shall not be a defense under this section if such mental disease or defect was proximately caused by the voluntary ingestion, inhalation or injection of intoxicating liquor or any drug or substance, or any combination thereof, unless such drug was prescribed for the defendant by a licensed practitioner, as defined in section 20-184a, and was used in accordance with the directions of such prescription."

[28] As a preliminary matter, the defendant argues that appellate review of a claim of evidentiary insufficiency should be limited to the evidence on the record at the close of the state's case. He advocates, therefore, that we abandon the so-called "waiver rule," announced in *State* v. *Rutan,* 194 Conn. 438, 440, 479 A.2d 1209 (1984), which provides that if the defendant elects to introduce evidence after the trial court denies his motion for a judgment of acquittal, appellate review "encompasses the evidence in

statutory intent to commit murder was insufficient to preclude the reasonable hypothesis of recklessness and that the evidence, therefore, supported only a conviction for a lesser included offense.[29] We conclude that the state's evidence concerning the defendant's intent and mental capacity was sufficient to support the jury's verdict, and that the trial court properly denied the defendant's motions for a judgment of acquittal.

A defendant acts "intentionally" in causing the death of another when he or she has the conscious objective to cause another's death. General Statutes §§ 53a-3 (11) and 53a-54a. "Intent involves 'a mental process which ordinarily can be proven only by circumstantial evidence.' " *State* v. *Rasmussen,* 225 Conn. 55, 74, 621 A.2d 728 (1993); see also *State* v. *Salz,* 226 Conn. 20, 32–33, 627 A.2d 862 (1993). "The law recognizes no distinction between circumstantial evidence and direct evidence so far as probative force is concerned. . . . Intent is a question of fact, the determination of which should stand unless the conclusion drawn by the trier is an unreasonable one." (Citation omitted; internal quotation marks omitted.) *State* v. *Bzdyra,* 165 Conn. 400, 403, 334 A.2d 917 (1973); see also *State* v. *Rasmussen,* supra. "Intent may be inferred from the nature of any weapons used, the manner in which they were used and the nature and number of wounds inflicted."

---

toto," including evidence introduced by the defendant. See *State* v. *Hufford,* 205 Conn. 386, 391 n.5, 533 A.2d 866 (1987); *State* v. *Simino,* 200 Conn. 113, 118, 509 A.2d 1039 (1986); *State* v. *Lizzi,* 199 Conn. 462, 464, 508 A.2d 16 (1986); but see *State* v. *Williams,* 202 Conn. 349, 351 n.3, 521 A.2d 150 (1987). We need not address this argument because, as we conclude hereinafter, the evidence introduced by the state was sufficient to prove the essential element of "intent to cause the death of another person." General Statutes § 53a-54a.

[29] The defendant requested that the trial court instruct the jury on the lesser included offenses of manslaughter in the first degree, manslaughter in the second degree with a firearm, and criminally negligent homicide; see General Statutes §§ 53a-55 (a) (1) and (2), 53a-56a and 53a-58; and the court did so.

*State* v. *Rasmussen,* supra; see also *State* v. *Carpenter,* 214 Conn. 72, 82–83, 570 A.2d 203 (1990). For example, a jury may properly infer that a defendant had an intent to kill a victim from the evidence that the defendant used a deadly weapon to kill the victim, the manner in which the weapon was used, and the nature and number of wounds inflicted. *State* v. *Rasmussen,* supra; *State* v. *Bzdyra,* supra, 404.

" 'That the jury might have drawn other possible inferences from [the evidence] is not sufficient to undermine its verdict, since proof of guilt must be established beyond a reasonable doubt, not beyond a possible doubt.' " *State* v. *Grant,* 219 Conn. 596, 604, 594 A.2d 459 (1991), quoting *State* v. *Sinclair,* 197 Conn. 574, 578, 500 A.2d 539 (1985). Upon appellate review, "[w]e . . . review the evidence presented at trial, construing it in the light most favorable to sustaining the facts . . . impliedly found by the jury." *State* v. *Jarrett,* 218 Conn. 766, 770–71, 591 A.2d 1225 (1991); see also *State* v. *Salz,* supra, 30–31; *State* v. *Famiglietti,* 219 Conn. 605, 609, 595 A.2d 306 (1991).

The jury heard the testimony of the state's chief medical examiner that the victim had died from gunshot wounds fired from a .38 caliber handgun and that one of the bullets had entered her chest, passed through her heart and severed her spinal cord. Four bullets pierced the closet door in front of which the victim's body was discovered. The state also presented evidence that the defendant had left the scene when the victim was dead or in extremis and that he apparently made no effort to seek medical assistance for her. In addition, the jury heard testimony of intrigue and jealousy concerning the defendant, the victim and the victim's former boyfriend, Gerald Wallisa,[30] as well as evidence

---

[30] Wallisa's testimony is summarized in part III of this opinion.

that the defendant had physically abused the victim not long before her death.[31]

Although it is true, of course, that the state's proof of the defendant's guilt must exclude every reasonable supposition of innocence, a mere hypothesis of innocence will not suffice. *State* v. *Morrill,* 193 Conn. 602, 611, 478 A.2d 994 (1984); see also *State* v. *Salz,* supra, 29. And, "[a]lthough some evidence may be inconsistent with the state's theory of the case, the jury is not bound to credit only that evidence to the exclusion of evidence consistent with the state's theory. *State* v. *Pinnock,* 220 Conn. 765, 775–76, 601 A.2d 521 (1992)." *State* v. *Salz,* supra, 29–30. The defendant's assertion that he is entitled to a judgment of acquittal "springs from his supposition of inferences that the jury could have drawn while ignoring inferences consistent only with his guilt that the jury did reasonably draw." Id., 30. Because the circumstances surrounding the death of the victim permitted the jury to conclude beyond a reasonable doubt that the defendant had intended to cause the victim's death, the trial court properly denied the defendant's motion for a judgment of acquittal.

### III

The defendant also claims that the trial court improperly denied his motion for a judgment of acquittal because the evidence he introduced at trial established, as a matter of law, his affirmative defense of insanity

---

[31] The jury also heard testimony from Walter Young; see part III of this opinion; that the defendant had steadily consumed cocaine and alcohol for several days prior to the fatal shooting on September 13, 1986, and on that date as well. Although it is clear that the "defendant's intoxication is relevant to the determination of his capacity to form a specific intent to commit a crime"; *State* v. *Vinal,* 198 Conn. 644, 658, 504 A.2d 1364 (1986); the jury could reasonably have determined that the defendant, even if intoxicated at the time of the shooting, was capable of forming the specific intent required to commit the crime of murder. See, e.g., *State* v. *Traficonda,* 223 Conn. 273, 279, 612 A.2d 45 (1992).

by a preponderance of the evidence. A review of the evidence introduced at trial, however, reveals a sufficient basis for the jury's rejection of the defendant's affirmative defense.

The defense relied primarily on the testimony of three experts and a deputy sheriff. Jeremy August, a psychiatrist who had examined the defendant at his request, testified: that the defendant was suffering from a bipolar affective disorder, a manic depressive illness; that persons suffering from this illness experience periods of relatively normal functioning that may be interrupted by episodes of depression or mania; and that the defendant's belief that he was on a special mission from God to purge evil from the world is typical of those who suffer from the illness. August concluded that on September 13, 1986, the defendant had been unable to conform his conduct to the requirements of the law.

Melvin Roy, a clinical psychologist, administered a battery of psychological tests to the defendant after he had been incarcerated. He diagnosed the defendant as having an affective bipolar disorder in partial remission. Elizabeth Augustine, also a clinical psychologist, administered psychological tests to the defendant and reviewed information supplied by August and Roy. She diagnosed the defendant as having a bipolar disorder and concluded that he had been unable to conform his behavior to the requirements of the law or to appreciate the wrongfulness of his actions on September 13, 1986.

David Villa served as a deputy sheriff at the Bridgeport courthouse on September 15, 1986, the date of the defendant's arraignment. He testified that the defendant's behavior "was the most bizarre episode I've ever seen in fifteen years of service," and that the defendant giggled and laughed and told Villa that he was God.

Villa observed that the defendant was "[s]weating profusely and his eyes had a very peculiar and bizarre appearance to them." The defendant's behavior on the day of his arraignment caused a group of deputies to place the defendant in a full body manacle.

The state's evidence in derogation of the defendant's insanity defense consisted of the cross-examination of the defendant's witnesses and the introduction of various exhibits. On cross-examination, August testified that the pattern of the illness "is one of recurring episodes with relatively good interepisodic functioning" and that "[t]he frequency of manic . . . episodes is largely individual . . . so that one person might have a manic episode once every ten years . . . [or] once every two months . . . [or] hourly." Although he did not agree with the diagnosis, August conceded that, upon the defendant's transfer from the Bridgeport Correctional Center to Fairfield Hills State Hospital, he had been diagnosed as a malingerer.[32] On the basis of documents shown to him by the prosecutor, August also acknowledged: that the defendant had told persons at Fairfield Hills State Hospital that he pretended to be crazy so that he could get out of jail; that the staff there had found that the defendant did not suffer from any significant mental illness; that the defendant had a substantial history of substance abuse and that he apparently would also qualify for a substance abuse diagnosis; that a psychiatrist at the Whiting Forensic Institute had diagnosed the defendant as suffering from a cocaine disorder leading to psychotic symptoms; and that the defendant had not been a behavioral problem at either Whiting Forensic Institute or the Bridgeport Correctional Center, where he had sustained good functioning for extended periods of time.

---

[32] August defined malingering as "the conscious manipulation of facts and details for self-serving ends. Basically lying about your condition so that people will believe [that you suffer from the feigned condition]."

The state elicited on its cross-examination of Augustine that she customarily conducts twelve hours of psychological tests on her patients but administered only three hours of such tests to the defendant. Augustine also acknowledged that she had not settled on a diagnosis of the defendant until the day before she testified. In addition, the state demonstrated that none of the defense experts had observed the defendant until at least six months after the commission of the alleged crime. The state also impeached Roy with evidence of a felony conviction for larceny. Roy testified that the defendant had not been psychotic at the time Roy tested him.

The state also elicited the testimony of a rebuttal witness, Gerald Wallisa, who had lived with the victim for two years. In late August, 1986, Wallisa and the victim moved into the defendant's apartment. Soon thereafter, the three became involved in an argument and the defendant threatened to kill Wallisa and told him to move out, which he did. A short while later Wallisa returned to visit the victim. The defendant approached them, grabbed the victim and proceeded to drag her down a driveway. The defendant persisted in this conduct notwithstanding the victim's screams and protests that the defendant was hurting her.

The state also relies on evidence introduced in its case-in-chief to support its contention that the jury reasonably could have found the defendant's conduct resulted not from a mental disease or defect but instead from his voluntary ingestion of cocaine and alcohol. A witness, Walter Young, testified that he had known the defendant for six years and that in September, 1986, he had been remodeling a bathroom on the second floor of the apartment building at 605 Hallett Street, in which the defendant lived. Young stated that he had last seen the defendant and the victim between midnight and 2 a.m. on September 13, 1986, seated at the

kitchen table of their third floor apartment. Both were drinking alcohol and smoking cocaine. Young also testified that the defendant and the victim had been drinking and ingesting cocaine that day and evening and that they had been "partying" for four days, that the defendant, who also had provided Young with alcohol and cocaine, was ingesting cocaine whenever Young went up to his apartment, and that the defendant was rundown, perspiring and had not slept for quite some time.

It is apparent, therefore, that the jury reviewed conflicting evidence on the issue of the defendant's mental capacity at the time he fatally shot the victim. The evaluation of such conflicting evidence on the issue of legal insanity is the province of the finder of fact. *State* v. *Perez,* 182 Conn. 603, 610, 438 A.2d 1149 (1981). "[W]e have repeatedly stated that our review of the conclusions of the trier of fact . . . is limited. . . . This court will construe the evidence in the light most favorable to sustaining the trial court's [judgment] and will affirm the conclusion of the trier of fact if it is reasonably supported by the evidence and the logical inferences drawn therefrom. . . . The probative force of direct and circumstantial evidence is the same. . . . The credibility of expert witnesses and the weight to be given to their testimony and to that of lay witnesses on the issue of sanity is determined by the trier of fact." (Citations omitted; internal quotation marks omitted.) *State* v. *Steiger,* 218 Conn. 349, 378–79, 590 A.2d 408 (1991).

Although expert witnesses testified on behalf of the defendant and the state called none, that alone is not a sufficient basis to disturb the verdict on appeal; see, e.g., *State* v. *Evans,* 203 Conn. 212, 237–38, 523 A.2d 1306 (1987); *State* v. *Perez,* supra, 608–10; for the jury "can disbelieve any or all of the evidence on insanity and can construe that evidence in a manner different

from the parties' assertions." *State* v. *Steiger,* supra, 381; see also *State* v. *Jarzbek,* 204 Conn. 683, 707, 529 A.2d 1245 (1987), cert. denied, 484 U.S. 1061, 108 S. Ct. 1017, 98 L. Ed. 2d 982 (1988); *State* v. *Putnoki,* 200 Conn. 208, 221, 510 A.2d 1329 (1986). The jury had before it the expert testimony presented by the defendant and the state's vigorous attack upon it, as well as other evidence introduced by the state on the issue of the defendant's sanity. The jury was free to reject, in whole or in part, the expert defense testimony, and to credit the state's evidence, including the conclusions of the state medical personnel, elicited on cross-examination of the defendant's experts, that the defendant was a malingerer who did not suffer from a serious mental illness.[33] The jury may have determined, alternatively, that the defendant's behavior was due not to a mental disease or defect, but instead to his voracious consumption of alcohol and cocaine. See General Statutes § 53a-13 (b). As we have stated, however, "[i]t is not necessary for us to determine the reasons which the trier had for concluding that the defendant had substantial capacity both to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of law." *State* v. *Perez,* supra, 606. We must determine only whether any reasonable trier of fact could have rejected the defendant's affirm-

---

[33] See *State* v. *Perez,* 182 Conn. 603, 609–10, 438 A.2d 1149 (1981). In *Perez,* the defendant claimed that he lacked the mental capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of the law. The state, which at that time bore the burden of establishing the defendant's sanity beyond a reasonable doubt, did not call any expert witnesses and relied instead upon its cross-examination of the defendant's psychiatric expert and the documents introduced through that expert witness. We held that "[t]he trier was entitled . . . to find that the state had met its burden of proving the defendant's sanity beyond a reasonable doubt by introducing the medical records of his stay at Whiting [Forensic Institute]. These records are fully probative even though they were introduced as part of the cross-examination of [the defense expert] rather than as part of the state's case-in-chief." Id.

ative defense of insanity. We conclude that the evidence introduced at trial permitted the jury to reject the defendant's claims that he did not appreciate the wrongfulness of his conduct and that he was unable to conform his conduct to the requirements of the law at the time he killed the victim.

The judgment is affirmed.

In this opinion PETERS, C. J., CALLAHAN and BORDEN, Js., concurred.

BERDON, J., dissenting.

I

I must first address a preliminary matter that greatly concerns me. The court has arrived at this juncture by granting a motion to vacate our judgment of August 24, 1993, in *State* v. *Medina,* 227 Conn. 456 (1993) (*Medina I*), and reconsider the case with a reconstituted court (motion).[1] In *Medina I,* a majority of this

---

[1] When this motion was made available to the justices on October 7, 1993, I voted in favor of the motion, as the majority indicates. Nevertheless, shortly thereafter I requested reconsideration of the motion, expressing my concern that we should not have voted on it for the reasons set forth in part I of my dissent. Thereafter, on October 19, 1993, I addressed the issue in writing as follows: "I continue to be concerned about the action we took on the *Medina* motion for reconsideration. I believe that before acting on the same we should have required at least an affidavit from the public defender. Once a judgment of this Court is publicly announced and the justice who sat on the case concedes that he or she had a conflict of interest at that time, at the very least, the specific facts that were the basis of the conflict and the time frame should be publicly disclosed before reconsideration is ordered. The reconsideration of the judgment involves the court's credibility; the public has a right to know why we are reconsidering the judgment *and so do we.* For these reasons, I *may* want to write, as part of the *Medina* opinion, on this issue as well as the procedural posture of the case which led up to the adoption of the motion for reconsideration at conference on October 7, 1993. Since I previously indicated that I would not write on this issue, I want to put the other justices on notice that I may do so." (Emphasis in original.) My efforts to have the court reconsider this motion occurred prior to the oral argument on November 2, 1993, of this case, *Medina II.*

court affirmed the defendant's convictions for murder and two narcotics offenses. I dissented in *Medina I* and continue to dissent in the present case (*Medina II*), as will be explained in greater detail in part II of this opinion.

G. Douglas Nash, chief of legal services for the office of the chief public defender, filed the motion for reconsideration on behalf of the defendant, Angel Medina, Jr. The motion merely stated in a conclusory fashion that there may have been a conflict of interest between the assistant public defender who represented the defendant on his *Medina I* appeal and a justice of this court, as follows: "The undersigned [Nash] has had conversations with [the assistant public defender who argued *Medina I*]. As a result, certain facts have come to my attention such that I reasonably believe it was a conflict of interest for [one of the justices of this court] to participate in the decision of this case. See Rules of Professional Conduct, terminology ('reasonably believes'). As an officer of the court, I herein state that I reasonably believe the facts stated to me were true and they are such that [the justice] should be disqualified from this case. . . . [Rules of Professional Conduct], 5.1 (b), 5.1 (c) (1); Code of Judicial Conduct, Canon 2B, 3C (1) (a). . . . I therefore respectfully move the Court to vacate the decision and resubmit the case to the Court. The undersigned only moves that [the justice] be disqualified from the reconstituted Court. This conflict does not affect any other Justice."[2] The justice referred to in the motion has acknowledged that he should have recused himself.

---

[2] The terminology section of the Rules of Professional Conduct provides in relevant part: " 'Reasonable belief' or 'reasonably believes' when used in reference to a lawyer denotes that the lawyer believes the matter in question and that the circumstances are such that the belief is reasonable."

Rule 5.1 of the Rules of Professional Conduct provides in relevant part: "(b) A lawyer having direct supervisory authority over another lawyer shall

I have no doubt that, prior to the issuance of the judgment, a justice or judge may recuse himself or herself from a case without furnishing any reason to the parties, the other members of the court or the public. See *Laird* v. *Tatum,* 409 U.S. 824, 824 and n.1, 93 S. Ct. 7, 34 L. Ed. 2d 50 (1972) (memorandum of Rehnquist, J., on motion to recuse). This is the case even though a judge "has the duty to *sit* where *not disqualified* which is equally as strong as the duty to *not sit* where *disqualified.*" (Emphasis in original.) Id., 837. I suppose that the lack of a requirement to state reasons serves to encourage justices and judges to recuse them-

make reasonable efforts to ensure that the other lawyer conforms to the rules of professional conduct.

"(c) A lawyer shall be responsible for another lawyer's violation of the rules of professional conduct if:

"(1) The lawyer orders or, with knowledge of the specific conduct, ratifies the conduct involved . . . ."

Canon 2 of the Code of Judicial Conduct provides in relevant part: "B. A judge should not allow the judge's family, social, or other relationships to influence his or her judicial conduct or judgment. The judge should not lend the prestige of judicial office to advance the private interests of others; nor should the judge convey or permit others to convey the impression that they are in a special position to influence him or her. The judge should not testify voluntarily as a character witness."

Canon 3 of the Code of Judicial Conduct provides in relevant part: "C. DISQUALIFICATION.

"(1) A judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:

"(a) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding . . .

"(d) the judge or the judge's spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

"(i) is a party to the proceeding, or an officer, director, or trustee of a party;

"(ii) is acting as a lawyer in the proceeding . . .

"(iii) is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

"(iv) is to the judge's knowledge likely to be a material witness in the proceeding . . . ."

selves in situations where, although disqualification may not be legally required, the interests of justice will be better served if the judge disqualifies himself or herself. For example, although the Code of Judicial Conduct *requires* that a judge disqualify himself or herself if the judge's brother is the lawyer in the case; see Code of Judicial Conduct Canon 3.C (1) (d) (ii); I could readily understand if a judge recused himself or herself because a cousin was the lawyer in the case, even though recusal would not legally be required.[3] See Code of Judicial Conduct, commentary to Canon 3.C (3) (a).[4]

Nevertheless, the situation in the present case differs significantly from the situation where a judge merely recuses himself or herself *prior* to the announcement of a judgment. Although I do not agree with the outcome of *Medina I*, this court rendered a *judgment* in that case. I do not believe that a judgment should be vacated and the case reargued without there being good and sufficient reason *on the record*. The bare fact that a justice believes, in hindsight, that he should have recused himself from a case prior to judgment being rendered is not a sufficient ground to justify vacating a judgment after it is rendered. See, e.g., *Timm* v. *Timm,* 195 Conn. 202, 205, 487 A.2d 191 (1985) (failure to raise the disqualification issue before judgment

---

[3] Nevertheless, it is important to point out that although the justice or judge may not come within the degree of relationship prohibited by the rules, a justice or judge also must "disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned . . . ." Code of Judicial Conduct Canon 3.C (1); *State* v. *Santangelo,* 205 Conn. 578, 602, 534 A.2d 1175 (1987) ("Disqualification of a . . . judge is not dependent on proof of actual bias. The appearance and existence of impartiality are both essential elements of a fair trial.").

[4] The commentary to Canon 3.C (3) (a) of the Code of Judicial Conduct provides: "According to the civil law system, the third degree of relationship test would, for example, disqualify the judge if the judge's or the judge's spouse's parent, grandparent, uncle or aunt, sibling, or niece's or nephew's spouse were a party or lawyer in the proceeding, but would not disqualify the judge if a cousin were a party or lawyer in the proceeding."

"can be construed as the functional equivalent of 'consent in open court' " pursuant to General Statutes § 51-39 [c],[5] which allows the judge to hear the case).

The other justices of this court have not been advised of the specific predicate facts underlying the "conflict," nor has the extent of the "conflict" been described to us. On the basis of the scant record before us, the majority nevertheless granted the motion for reconsideration, which was filed thirty days *after* the expiration of the time permitted by the rules.[6] Although I know that we have the power to vary these rules in order to do justice; see Practice Book § 4187; it concerns me greatly that a majority of this court has acted on the basis of a conclusory motion and a concession by the justice that may or may not warrant vacating a judgment of this court.[7] See *State* v. *Watson,* 198 Conn. 598, 611, 504 A.2d 497 (1986) (alleging in a conclusory fashion that a judge should be disqualified from hearing a motion without establishing the necessary facts on the record is insufficient, especially where the judge has already ruled on the motion).[8]

---

[5] General Statutes § 51-39 (c) provides: "When any judge . . . is disqualified to act in any proceeding before him, he may act if the parties thereto consent in open court."

[6] Practice Book § 4121 provides that a motion for reargument or reconsideration must be filed within ten days from the date the decision on the case is issued. *Medina I* was issued on August 24, 1993. The motion for reconsideration was not filed until October 4, 1993.

[7] Although we do not have formal rules for the disqualification of a justice of the Supreme Court, the rules of the Superior Court are illuminating. The bare bones motion filed in this case would be insufficient to trigger a disqualification, and therefore reargument, under the rules of the Superior Court. This is because Practice Book § 997 provides that a motion for disqualification must "be accompanied by an affidavit setting forth the facts relied upon to show the grounds for disqualification . . . ." See also *McGuire* v. *Blount,* 199 U.S. 142, 143, 26 S. Ct. 1, 50 L. Ed. 125 (1905) (for recusal to be required, there must be facts in the record establishing or offering to establish the basis for disqualification of the judge); *State* v. *Santangelo,* 205 Conn. 578, 585, 534 A.2d 1175 (1987).

[8] I take judicial notice of the fact that this matter has been referred by the Chief Justice to the Judicial Review Council for its consideration. The

Although an individual justice may have discretion to disqualify himself or herself from a case prior to judgment when legally not required to do so, once the judgment is announced different factors come into play. The reason is simple. If our judgments could be vacated after issuance in the absence of sufficiently detailed predicate facts to justify that action, and without public disclosure of those facts, all of our judgments would become suspect. There would be nothing to prevent the court from vacating a judgment a year or more after it is issued just because one of the justices is prompted by a conclusory motion of a party to disclose that the justice believes there was a conflict of some kind. For that matter, there would be nothing to prevent the court from vacating a judgment for any other reason. If this court permits itself to take such action without the nature of the conflict being subject to court and public scrutiny, our judgments will lose their credibility, and the integrity of the judicial process will be placed in serious question.

In the present case, the state's attorney for Fairfield County, whose office assumed the responsibility for representing the state in *Medina I*, took no position on the motion. Nevertheless, the office of the chief state's attorney for the state of Connecticut voiced the same concerns that I express herein when it took the following position in regard to other cases allegedly involving a conflict between the same assistant public defender and the same justice: "I have been, and continue to be, uninformed as to the conflict of interest alleged by Attorney Nash. The state is therefore handicapped in responding to his assessment of the impact

nature of the "conflict" may or may not become public information. See General Statutes § 51-51*l*. Nevertheless, actions taken by this court in the absence of the necessary factual predicate cannot be subsequently justified by disclosures that are made by or in the course of proceedings before the Judicial Review Council.

of the alleged conflict on the rights of the parties to these appeals. Without knowing what the alleged conflict is or how it arose, the state cannot be certain it is accurately and fairly gauging its impact on state interests in these, or any other pending or decided cases. . . . I assure you that the state has no interest in embarrassing any Justice of this Court or any attorney appearing before it. However, the state is concerned lest, as in *Medina*, decided criminal cases are reopened despite the absence of record facts supporting such action. As I stated in my letter to Chief Judge Dupont [of the Appellate Court] regarding similarly-situated appeals in the Appellate Court, I respectfully submit that the administration of justice is not best served by the nondisclosure of information which may affect the integrity of criminal proceedings. Moreover, information regarding the nature and duration of the alleged conflict may be critical to the state in the fulfillment of its duties in these appeals or in collateral proceedings arising from these cases. It is for this reason that I must object to Attorney Nash's alerting the Court to a possible conflict without providing any information about that conflict."[9]

I have no doubt that a certain amount of confidentiality is required for this branch of government to perform its decision-making duties. But in a democracy, confidentiality must be kept to the bare minimum that is needed in order for this court to function. I believe that the line is crossed when we publicly announce a decision of this court, then vacate it under a veil of confidentiality. Both the public and the other justices have a right to know the predicate facts that are the basis for the reconsideration of a judgment. The public needs to know what this branch of government is "up to" just

[9] This excerpt is taken from a letter dated November 1, 1993, to Chief Justice Ellen Peters from Susann E. Gill, supervisory assistant state's attorney, appellate unit, office of the chief state's attorney.

as much as it needs to know what the other branches are "up to." See *Gifford* v. *Freedom of Information Commission,* 227 Conn. 641, 677, 631 A.2d 252 (1993) (*Berdon, J.,* dissenting).

Accordingly, before considering the motion we should have required, at the very least, an affidavit from the assistant public defender or from Nash setting forth sufficient underlying facts to justify vacating the judgment and ordering a reconsideration of the case.

## II

Today, the majority upholds the defendant's conviction for the crime of murder, even though it may have been predicated on a confession made while the defendant was mentally ill, in violation of our state constitution. The defendant's pretrial motion sought to suppress statements made when he was apprehended on the day of the victim's death and when he was being escorted to the hospital. At that time, the defendant stated: "The devil made me do it"; "I killed the devil"; "I am God." The defendant argues before this court that these statements were involuntary because they were made while he was insane; therefore their admission into evidence violated his right to due process under article first, § 8, of the Connecticut constitution.[10]

Before setting forth my dissent in regard to the merits of the defendant's claim, which is essentially the same as my dissent in *Medina I,* I find it necessary to make some additional comments on another matter of great importance. The majority refuses to review the defendant's state constitutional claim on the grounds that it was not raised before the trial court, and that there is an insufficient record to review the claim under

---

[10] The constitution of Connecticut, article first, § 8, provides in relevant part: "No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law . . . ."

*State* v. *Golding,* 213 Conn. 233, 567 A.2d 823 (1989). I agree with the majority that the defendant failed to raise the issue before the trial court.

Nevertheless, we profess to do justice. Is it just to refuse to review a claim made under the state constitution that could have a substantial bearing on whether the defendant is guilty of *intentional* homicide, merely because the public defender[11] appointed by the state failed to raise the issue at trial? Even if the majority of this court were correct in concluding that the record contains insufficient facts for us to decide this issue—a point I do not concede—a new trial would not be necessary. We could do justice by simply remanding this case to the trial court for an evidentiary hearing to determine whether the defendant's statements were voluntary. This court has used this procedure in other cases when it suited us, as discussed below, but the majority declines to do so for the defendant. It troubles me that this court is affirming a judgment sentencing the defendant to a prison term of fifty-one years—probably a life sentence for Mr. Medina—when the conviction may have been based on statements made while insane. Speaking for eight of the nine justices of the United States Supreme Court, Chief Justice Earl Warren stated the following: "Surely in the present stage of our civilization a most basic sense of justice is affronted by the spectacle of incarcerating a human being upon the basis of a statement he made while insane; and this judgment can without difficulty be articulated in terms of the unreliability of the confession, the lack of rational choice of the accused, or simply a strong conviction that our system of law enforcement should not operate so as to take advantage of a person in this fashion." *Blackburn* v. *Alabama,* 361 U.S. 199, 207, 80 S. Ct. 274, 4 L. Ed. 2d 242 (1960).

---

[11] The defendant was represented by a different public defender at trial than on appeal.

The majority's refusal to consider the state constitutional claim reflects on two interrelated matters—the right to counsel, and the restrictive rules that preclude judicial review of unpreserved claims. It is beyond debate that under both the federal and state constitutions, an accused has a fundamental right to the assistance of counsel.[12] See, e.g., *Gideon* v. *Wainwright,* 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963); *Powell* v. *Alabama,* 287 U.S. 45, 53 S. Ct. 55, 77 L. Ed. 158 (1932); *State* v. *Palmer,* 206 Conn. 40, 64, 536 A.2d 936 (1988); *State* v. *Gethers,* 193 Conn. 526, 533, 480 A.2d 435 (1984).[13] Counsel must, of course, be provided for

[12] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense."

Article first, § 8, of the constitution of Connecticut provides in relevant part: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel . . . ."

[13] In *State* v. *Stoddard,* 206 Conn. 157, 164–65, 537 A.2d 446 (1988), this court recognized this state's historical commitment to the right to counsel: "This state has had a long history of recognizing the significance of the right to counsel, even before that right attained federal constitutional importance. Until 1836, the common law of England denied the services of counsel to a person charged with a felony for anything but advisory guidance on questions of law. *Powell* v. *Alabama,* 287 U.S. 45, 60, 53 S. Ct. 55, 77 L. Ed. 158 (1932). This rule was defended largely on the theory that the court itself was counsel for the accused. Id., 61.

"Although in 1708 Connecticut enacted a law prohibiting pleading for hire without the express consent of the court; *State* v. *Gethers,* 197 Conn. 369, 389–90 n.19, 497 A.2d 408 (1985); the custom of assigning counsel in all criminal cases quickly became the norm. *State* v. *Davis,* 199 Conn. 88, 99, 506 A.2d 86 (1986). By the end of the eighteenth century, the Connecticut legislature had 'abolished all those odious laws' arising from the English common law tradition and had assured that any person charged with a crime was 'entitled to every possible privilege in making his defence, and manifesting his innocence, by the instrumentality of counsel . . . .' 2 Z. Swift, A System of Laws of the State of Connecticut (1796) p. 399.

"When the customary right to counsel was formally incorporated into the Connecticut constitution in 1818, 'the advice and services of counsel were regarded as crucial to a criminal defendant at any time, especially given the inability of a defendant to testify in Connecticut in 1818.' *State* v. *Davis,* supra, 99–100. More contemporary developments suggest that this state's commitment to securing the right to counsel has not diminished

an accused who is indigent; *Gideon* v. *Wainwright,* supra; *State* v. *Harman,* 198 Conn. 124, 130, 502 A.2d 381 (1985); as was done in the present case for the defendant. The right to counsel, however, means the right to competent counsel. *Lozada* v. *Warden,* 223 Conn. 834, 841, 613 A.2d 818 (1992); *State* v. *Clark,* 170 Conn. 273, 284, 365 A.2d 1167, cert. denied, 425 U.S. 962, 96 S. Ct. 1748, 48 L. Ed. 2d 208 (1976). Otherwise, the right to counsel would be meaningless. *Cullins* v. *Crouse,* 348 F.2d 887, 889 (10th Cir. 1965).

The state constitutional issue in the present case had been raised in this court at least two years prior to the defendant's trial. *State* v. *Gonzalez,* 206 Conn. 213, 222, 537 A.2d 460 (1988) ("[t]his court has not had occasion to decide whether, in light of the recent United States Supreme Court decision in *Colorado* v. *Connelly,* [479 U.S. 157, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986)], a claim of involuntariness in the absence of any allegations of police overreaching may be successfully pursued under our state constitution"). The issue has been suggested by this court as early as 1986. *State* v. *Smith,* 200 Conn. 465, 478, 512 A.2d 189 (1986); see also *State* v. *Northrop,* 213 Conn. 405, 419, 206, 568 A.2d 439 (1990); *State* v. *Barrett,* 205 Conn. 437, 452, 534 A.2d 219 (1987). Indeed, the assistant state's attorney identified the issue for the defense at trial, but the trial public defender failed to recognize it. In an attempt to ascertain what direction the public defender was

since 1818. Not only was Connecticut 'the first state to adopt the public defender system'; *State* v. *Hudson,* 154 Conn. 631, 635, 228 A.2d 132 (1967); but the right to counsel 'was secured to criminal defendants in this state long before the mandate of *Gideon* v. *Wainwright,* 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 [(1962) (holding that the fourteenth amendment incorporated the sixth amendment right to counsel)] . . . .' *Spring* v. *Constantino,* 168 Conn. 563, 566–67 n.2, 362 A.2d 871 (1975). The United States Supreme Court has turned to the historical experience of Connecticut in expanding the right to counsel under the federal constitution. *Faretta* v. *California,* 422 U.S. 806, 827, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975); *Powell* v. *Alabama,* supra, 62–63."

headed on the motion to suppress, the assistant state's attorney stated: "What I am concerned about is the claim in [the public defender's] motion of not knowingly and voluntarily made, I need to know how. *Are they claiming that [the defendant] was so deficient and defective in his mental state that therefore we would have an issue we have to bring in medical testimony?* I don't know the answer to that." (Emphasis added.) The court asked the public defender to clarify his claim. In response he said: "Exactly, Your Honor . . . this is an insanity type defense. There's been testimony about the mental state of my client at the time the officer arrived; and I think there's precedent that talks about the knowing and voluntary aspect of it . . . ." At this point, it could be argued that he raised the issue, but the public defender subsequently lost the issue and focused his argument on the defendant's *Miranda*[14] rights in the following colloquy. The assistant state's attorney stated: "I would like to know what it is they are claiming is the violation of rights I can defend against." The public defender responded: "The question while in custody without prior warnings." The court asked: "What do you mean prior warnings?" The public defender responded: "*Miranda* warnings, a waiver of fifth amendment rights, Your Honor."

The failure to raise the issue is not necessarily the fault of the trial public defender. For the most part, "[t]hese competent and dedicated attorneys carry heavy caseloads . . . ." *Jackson* v. *Commissioner of Correction,* 227 Conn. 124, 139, 629 A.2d 413 (1993) (*Berdon, J.,* dissenting). The state must take its share of the blame when an attorney on its payroll fails to raise a constitutional issue that has been identified since 1986. Id., 140. An indigent defendant like Mr. Medina has no right to compel the state to engage counsel of

[14] See *Miranda* v. *Arizona,* 384 U.S. 436, 444, 86 S. Ct. 1062, 16 L. Ed. 2d 694 (1966).

his own choosing. *Douglas* v. *Warden,* 218 Conn. 778, 790, 591 A.2d 399 (1991); *State* v. *Gethers,* supra, 543. This being the case, it is incumbent on this branch of government to relax our rules so that justice may be accorded to persons like the defendant in the present case.

Although, under the facts of this case, I believe that the requirements of *State* v. *Golding,* supra, 239–40, are satisfied so that we may review the defendant's claim, the time is ripe for reconsideration of that doctrine. At the very least, as I indicate below, the first requirement for appellate review of an unpreserved claim under *Golding*—that is, that "the record is adequate to review the alleged claim of error"—should be relaxed in a case such as this where the missing record can be supplied through a mere hearing before the trial judge. It seems incredible to me that this state can supply the defendant with an attorney to fulfill its constitutional obligations, and then hold the accused responsible for that attorney's procedural defaults when there is not even a suggestion that his defaults were calculated to gain a tactical advantage.

Despite defense counsel's failure to raise the state constitutional issue before the trial court, I believe that the record is sufficient to warrant review under *Golding.* The record is replete with evidence of the defendant's seriously impaired mental condition. It is undisputed that the defendant suffered from bipolar affective illness (manic depressive illness) with psychotic features. At least one expert witness testified without contradiction that the defendant had suffered from this mental illness on the day that both the murder was committed and the statements the defendant sought to suppress were made.

In determining whether the record is sufficient for review, the majority ignores the standard of review for

determining the voluntariness of a confession we would employ if the trial court had decided the issue. "Although we normally give great deference to the factual findings of the trial court, the ultimate issue of whether the statement is voluntary and admissible is a legal determination. *Arizona* v. *Fulminante,* 499 U.S. 279, 287, 111 S. Ct. 1246, 113 L. Ed. 2d 302, reh. denied, 500 U.S. 938 , 111 S. Ct. 2067, 114 L. Ed. 2d 472 (1991)." *State* v. *Roman,* 224 Conn. 63, 76–77, 616 A.2d 266 (1992) (*Berdon, J.,* dissenting), cert. denied, U.S. , 113 S. Ct. 1868, 123 L. Ed. 2d 488 (1993). "On appeal, in order to determine whether the defendant's constitutional rights have been infringed, we review the record in its entirety and are not limited to the evidence before the trial court at the time the ruling admitting the statements was made." *State* v. *Toste,* 198 Conn. 573, 576, 504 A.2d 1036 (1986). Indeed, our examination of the record must be "independent and scrupulous" when determining whether a confession is admissible. *State* v. *Smith,* supra. "Accordingly, our standard of review is not whether the fact-finding of the trial court is 'clearly erroneous,' but whether, upon our review of the record, the state has proven that the incriminating statements were voluntarily made." *State* v. *Roman,* supra, 77. Therefore, we should, in determining whether the record is sufficient to satisfy *Golding,* review all the evidence that was before the trial court.

We undertook this precise review in *State* v. *Barrett,* supra. In *Barrett,* on remand from the United States Supreme Court, we reviewed for the first time under the state constitution whether the statements of the accused were admissible when the defendant's request for counsel was equivocal. Chief Justice Peters writing for an unanimous court stated: "[W]e have before us transcripts and exhibits that provide a trial record affording us a sufficient basis for addressing the defend-

ant's claim. Because this court has not yet addressed the precise state constitutional question that the defendant asks us to resolve, we conclude that the defendant's claim falls outside the realm of those 'well-known or long-established' constitutional rights that counsel should be required to have raised at the trial level. [*State* v. *Evans,* 165 Conn. 61, 68, 327 A.2d 576 (1973)]. State constitutional law is only now emerging from the shadow of its federal counterpart. It is therefore understandable that parties may not engage in elaborate discussion and analysis of untested and novel state constitutional theories in trial court proceedings where defense counsel has other more immediately accessible and tangible targets to pursue. 'The reality is that time for original analysis is scarce, particularly in the ordinary criminal case; and particularly at the trial level, lawyers and courts often depend on the shorthand of case citations in preference to scrutinizing statutes and constitutional principles.' *State* v. *Kennedy,* 295 Or. 260, 266, 666 P.2d 1316 (1983); see also E. Peters, 'State Constitutional Law: Federalism in the Common Law Tradition,' 84 Mich. L. Rev. 583, 589–92 (1986). We therefore conclude that the defendant's claim under article first, § 8, is reviewable at this juncture, despite his failure to raise the claim during the trial or on the original appeal." *State* v. *Barrett,* supra, 444–45.

The following facts are relevant to the determination of whether the statements are admissible. On September 13, 1986, Bridgeport police officers Kevin Meizies and James Sheffield responded to a telephone call from the defendant's sister, Lucy Ramirez, who was concerned and frightened because her brother had come to her home and was acting "like a madman." The officers arrived at the Ramirez residence to find the defendant standing in the kitchen with his hands in the air and a gun in his rear pants pocket. Meizies

testified that the defendant was sweating, seemed nervous and upset, and that "something was wrong obviously." Both Meizies and Sheffield testified with regard to the defendant's bizarre statements, noting that "[h]e said he killed the devil . . . [n]umerous times . . . . " In addition, after Meizies retrieved the defendant's gun, the defendant "went over to a female relative of his who had answered the door," and bowed in front of her, saying: " 'I killed the devil. I am Angel Medina. I am God' . . . [and] statements to that effect."

The officers were so concerned about the defendant's behavior that they transported him to the Bridgeport Hospital emergency room. On the way to the hospital, the defendant continued with his bizarre behavior, mumbling unintelligibly, continuing to say that he was God and that he had killed the devil, and that "Mary gave me the drugs."

In addition, as the majority acknowledges, David Villa, who was on duty as deputy sheriff at the Bridgeport courthouse when the defendant was arraigned, and who had observed the defendant for six hours, testified that the defendant's behavior "was the most bizarre episode I've ever seen in fifteen years of service." Villa testified that the defendant's eyes were "bugged out . . . extended out a lot further than a normal person would. They were blood shot, puffy around the lids and actually [had] the appearance that they were bulging out of his head." Villa further testified that "the defendant told me directly that he was the devil. On many occasions. He also told me that he was God." According to Villa, the defendant engaged in a cyclical pattern of behavior, which continued for approximately six hours, being "quiet and almost withdrawn in tears at the back of the cell," then becoming loud, "screaming in a high voice that he was the devil," and "thrashing around in the cell." Villa testified that the defendant "would . . . go in for a few moments

of giggling and laughter in the cell, moving around very agitated in the cell." The defendant's behavior was "so intense, that a group of deputies, including [Villa], entered the cell and placed [the defendant] into a full body manacle which consisted of a set of leg irons and a belly chain."

Prior to trial, on September 30, 1987, the trial court granted the defendant's motion for a psychiatric examination. After evaluating the defendant, the clinical team, comprised of social workers, psychiatrists and psychologists, determined that the defendant was *not competent* to stand trial. They specifically noted that "a major concern to team members was the defendant's religious delusional system which now substantially interferes in his current competency to stand trial." The clinical team also documented that the defendant had "indicated that he believes he is a gifted child, has special powers and may be one of Jesus' followers. He has little concern over what could happen with his human body and twenty years or life imprisonment does not really matter to him. He somewhat philosophized that none of us could really be around even two days from now. He believed that he had died and had come back to life at about the same time that [the victim] was found dead. He has powers and his actions that resulted in his arrest are 'beyond the recollection of man's knowledge.' He then went on to state that time actually went backwards for everyone in August and September of last year. He states that he knows this as it was written in one book and that most people are not aware that time had in fact gone backwards. . . . He did make reference to killing the devil, being very vague as to who the devil was. This coincides with the arrest incident report that made reference to a similar statement."

After the defendant was found incompetent, he was admitted to Fairfield Hills State Hospital. On Novem-

ber 2, 1987, he was transferred to Whiting Forensic Institute (Whiting). At Whiting, although he was diagnosed as having a delusional disorder (paranoia), he was nevertheless declared competent to stand trial. The trial court did not rule on the motion to suppress statements until March 19, 1990, at which point it denied the motion despite the 1987 report indicating that the defendant had not been competent to stand trial at that time and had suffered from religious delusional problems consistent with the statements he sought to suppress.

At trial, the defendant offered the testimony of three experts—Jeremy August, a psychiatrist, and Elizabeth Augustine and Melvin Roy, clinical psychologists. August diagnosed the defendant as having bipolar affective illness, formerly known as manic depressive illness, with psychotic features. August explained that when bipolar affective illness becomes quite severe, "thinking is disrupted, delusional ideas such as being God or being Satan or being possessed by the devil become prominent; and when that happens, then you have the extra diagnosis of psychotic features." He further testified that he had observed such psychotic features in the defendant when they met in 1987, and noted that the defendant "believed that he was in a special relationship with God and that he had a mission to kill the devil." Finally, August testified that the defendant was suffering from bipolar affective illness on the date of the murder.

After performing a battery of psychological tests on the defendant, Melvin Roy concluded that the defendant "has a serious affective [bipolar] disorder in partial remission." Roy described affective bipolar disorder as "a serious disturbance in mood which affects the individual's behavior drastically . . . in other words, a psychotic disorder." Roy testified that although the defendant had not been psychotic when tested, he had

concluded that the defendant had been suffering from affective bipolar disorder at the time of the murder.

Elizabeth Augustine testified that she had begun testing the defendant, but had been unable to complete the usual battery of tests, which takes approximately eight or nine hours, because the defendant had become agitated and was unable to concentrate or pay attention after approximately three hours. Augustine testified that during the testing, the defendant's "behavior and thinking was not within normal limits. He was stimulated by things that would not provoke bizarre thinking in normal individuals." Augustine testified that the defendant's behavior had included "rapid speech, agitation, bodily agitation, getting up, pacing, sitting down, getting up, pacing, sitting down, getting up, pacing. Once again, sitting down. Inability to sit still. Coming out with more bizarre statements and delusion material." She also testified that the defendant was "hyper-religious," and that he had stated "I am spirit and flesh. I am Holy Ghost." Finally, Augustine testified that the defendant's behavior was consistent with a person undergoing a manic phase of bipolar affective illness with psychotic features.

Although the state introduced evidence that the defendant had ingested drugs before he had made the statements at the Ramirez residence, there is also overwhelming evidence of the defendant's serious mental illness. *Indeed, no expert witness testified for the state that the defendant was in fact competent.* As the majority acknowledges, the evidence established "that the defendant was suffering from a bipolar affective disorder, a manic depressive illness; that persons suffering from this illness experience periods of relatively normal functioning that may be interrupted by episodes of depression or mania; and that the defendant's belief that he was on a special mission from God to purge evil from the world is typical of those who suffer from the

illness." The nature of the defendant's confession is consistent with this illness. Even if the defendant's mental state had resulted from his ingestion of drugs, however, his confession still could not be characterized as voluntary. *Townsend* v. *Sain,* 372 U.S. 293, 83 S. Ct. 745, 9 L. Ed. 2d 770 (1963).

Because the voluntariness of the statement is a legal question, there was overwhelming evidence before the trial court of the defendant's mental illness, and the state did not produce any live medical or other professional evidence to indicate that the defendant was mentally incompetent, I believe that the record is adequate to review the defendant's state constitutional claim.

Alternatively, I would remand this case to the trial court for an evidentiary hearing and for written findings. See *State* v. *Ellis,* 227 Conn. 902, 630 A.2d 73 (1993). Even if the record were not adequate, I would relax the rule under *State* v. *Golding,* supra, and review the claim because the defendant asserts the violation of a fundamental constitutional right and the record can be augmented simply by a hearing before the trial judge. In *State* v. *Ellis,* supra, 903, this court *on its own, without a request from either party, remanded the case "to the trial court for an evidentiary hearing and written findings . . . ."* (Emphasis added.) Likewise, in *State* v. *Pollitt,* 199 Conn. 399, 416, 508 A.2d 1 (1986), this court remanded the case to the trial court for a hearing to determine whether *Brady* materials were withheld from the defendant. *Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Moreover, in *State* v. *Patterson,* 227 Conn. 448, 629 A.2d 1133 (1993), we remanded the case to the three judge court for an articulation of the facts upon which the court based its decision. Indeed, a remand is particularly appropriate and fair in view of the trial court's decision on the motion to suppress, which indicated the court did not even reach the *Miranda* issues that were

clearly raised. At the conclusion of the evidentiary hearing on the motion to suppress, the trial court stated: "To my knowledge, there's no confession here nor any statement concerning the facts signed by the defendant." This issue has eluded us even though it has been squarely raised before this court; e.g., *State* v. *Roseboro,* 221 Conn. 430, 443–44, 604 A.2d 1286 (1992); the time has come to get to its merits.

I agree with the majority that under the federal due process clause, the fact that the defendant's confessions or admissions were made while he was insane does not affect their admissibility. In *Colorado* v. *Connelly,* 479 U.S. 157, 167, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986), a majority of the United States Supreme Court held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment" even though the admissions were made by the defendant when he was mentally ill.

Nevertheless, on the basis of my analysis in *State* v. *Stanley,* 223 Conn. 674, 696, 613 A.2d 788 (1992) (*Berdon, J.,* dissenting), which noted that prior to the adoption of the state constitution in 1818, the common law required that the prosecution prove the voluntariness of a confession beyond a reasonable doubt, I conclude that *Colorado* v. *Connelly,* supra, must be rejected under the state due process clause. In *Stanley,* I noted that "[t]he right to have the involuntary confession excluded, under the state constitution, is embraced in the following constitutional clause: No person shall be compelled to give evidence against himself . . . . Conn. Const., art. I, § 8 (1965). This clause is virtually identical to the one that appeared in our first formal constitution of 1818; Conn. Const., art. I, § 9 (1818); and that of the federal constitution. U.S. Const., amend. V. What is thereby protected from govern-

mental invasion is, quite simply, the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will. *Malloy* v. *Hogan,* [378 U.S. 1, 8, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964)]. Hence, a confession is involuntary and inadmissible unless it is the product of a rational intellect and a free will. *Blackburn* v. *Alabama,* [supra, 208] . . . . *Lego* v. *Twomey,* [404 U.S. 477, 491, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972)] (Brennan, J., dissenting). [Internal quotation marks omitted.]

"The value the framers of our state constitution placed on the right to remain silent is evident and important in determining the contours of the state constitutional protection. *State* v. *Geisler,* [222 Conn. 672, 685, 610 A.2d 1225 (1992)]. Zephaniah Swift, a leading jurist . . . of 1818, wrote in his treatise on the law that 'the confession must be perfectly voluntary: for if the *least degree of influence* appear to be exercised over the prisoner's mind, to induce him to disclose his guilt, the whole will be rejected.' (Emphasis added.) 2 Z. Swift, A Digest of the Laws of the State of Connecticut (1823) p. 408. Justice Swift also pointed out in his treatise on evidence that voluntary confessions 'are deemed to be the most conclusive evidence . . . .' Z. Swift, A Digest on the Law of Evidence (1810) p. 133. He also noted, however, that '[t]here is, perhaps, no part of evidence in which there is so much misrepresentation and fabrication, as in testifying to the confession of a party.' Id., p. 149.

"Common law precedent also leads me to the conclusion that our state constitution requires a higher standard of proof of voluntariness of a confession. E. Peters, 'Common Law Antecedents of Constitutional Law in Connecticut,' 53 Alb. L. Rev. 259, 263 (1989). Blackstone, in formally shaping the contours of our common law, wrote: '[I]ndeed, even in cases of felony

at the common law, [confessions] are the weakest and most suspicious of all testimony; ever liable to be obtained by artifice, false hopes, promises of favor, or menaces; seldom remembered accurately, or reported with due precision; and incapable in their nature of being disproved by other negative evidence.' 4 W. Blackstone, Commentaries on the Laws of England (1807) p. 357." *State* v. *Stanley,* supra, 698–99.

This analysis, which requires that the state prove the voluntariness of a confession beyond a reasonable doubt, has equal application when the confession was made by a person who is mentally ill. I believe that, under our state constitution, we should adopt the reasoning of Justice Brennan in his dissent in *Connelly,* as follows: "The absence of police wrongdoing should not, by itself, determine the voluntariness of a confession by a mentally ill person. The requirement that a confession be voluntary reflects a recognition of the importance of free will and of reliability in determining the admissibility of a confession, and thus demands an inquiry into the totality of the circumstances surrounding the confession." *Colorado* v. *Connelly,* supra, 176. Justice Brennan explained the requirements of reliability as follows: "Minimum standards of due process should require that the trial court find substantial indicia of reliability, on the basis of evidence extrinsic to the confession itself, before admitting the confession of a mentally ill person into evidence. To hold otherwise allows the State to imprison and possibly to execute a mentally ill defendant based solely upon an inherently unreliable confession." Id., 183.

In sum, in order to establish that a confession by a mentally ill person was voluntary and is therefore admissible, our state constitution mandates that the state prove: (1) that the statements were made by the defendant of his own free will; and (2) that there was

substantial indicia of reliability on the basis of evidence extrinsic to the confession.[15]

In view of the substantial evidence of the defendant's mental illness in this case, and that there was no other corroborative evidence to indicate that the defendant intended to kill the victim, I would hold that the statements were not voluntary. Accordingly, as I indicated in *Medina I,* I would order that the statements be suppressed and remand for a new trial. In the alternative, I would remand this matter to the trial court for the purposes of hearing evidence and to make the necessary findings as to voluntariness of the statements. See *State* v. *Pollitt,* supra, 416–17. Nevertheless, as I indicated in part I of this dissent, I would not have vacated the judgment in *Medina I* until such time as this court had before it a complete record to justify such action.

Accordingly, I respectfully dissent.

---

[15] Mental health issues in regard to the criminal law have not fared well during the past year. *State* v. *Stanley,* 223 Conn. 674, 689, 613 A.2d 788 (1992) (refusal to review under state constitution whether state is required to prove beyond a reasonable doubt that the defendant's confession was voluntary); *State* v. *Raguseo,* 225 Conn. 114, 126–28, 622 A.2d 519 (1993) (defense of extreme emotional disturbance is determined from the viewpoint of a "reasonable" person in the defendant's situation); *State* v. *Joyner,* 225 Conn. 450, 472, 625 A.2d 791 (1993) (upholding a statute imposing on the defendant in a criminal prosecution the burden of establishing the defense of mental disease or defect).

Today, we add to the list our refusal to reach the issue of whether under our state constitution we will admit incriminating statements made while the defendant was mentally ill.